In re Claim of Dependents of WILEY TOM SEABAUGH, Deceased, v. GARVER LUMBER MANUFACTURING COMPANY, Employer, and LUMBERMENS MUTUAL CASUALTY COMPANY, Insurer, Appellants. —No. 39940.—200 S. W. (2d) 55.

Court en Banc, February 10, 1947.

Rehearing Denied and Per Curiam Opinion Filed, March 10, 1947.

1154

*Oliver & Oliver* for appellants.

*Jack O. Knehans* for respondents.

█ LEEDY, J.—█ This is an appeal by the employer and insurer from the judgment of the Circuit Court of Cape Girardeau County affirming an award of compensation, in the sum of $3099.00, for the death of Wiley Tom Seabaugh, made by the Workmen's Compensation Commission to the widow and children of said deceased. The appeal went to the St. Louis Court of Appeals where, by a divided court, the judgment was affirmed. At the request of the dissenting judge, the cause was transferred here for final disposition. 193 S. W. 2d 370. But all of the judges agreed that, under Rule 3.24, appellants' notice of appeal had been timely filed, and so overruled respondents' motion to dismiss. We think the motion was properly ruled, and adopt what was said in that connection as our own opinion.

The deceased employee, Wiley Tom Seabaugh, did heavy manual labor, and had been in the regular employ of the lumber company for 21 years. He was 57 years of age, 5' 10 or 11" tall, and weighed 183 pounds. He died suddenly about 8:30 A. M. on February 19, 1944, while at work on the premises of the employer. His dependents, the respondents, filed their claim for compensation alleging that "Deceased was on one of employer's wagons assisting in the unloading of lumber when he fell several feet to the ground, apparently falling head first, and suffered a broken neck from which [he] died a few hours later."

The particular work in which deceased was admittedly engaged at the time of his death is referred to as jacking lumber—that is, he was on a low wagon, some two feet six or eight inches off of the ground, and which was by the side of a stack of lumber. There was a workman, called a stacker, on top of the stack, one Sanders, and it was Seabaugh's duty to get the lumber up on the stack to the stacker. While so engaged, he remarked to Sanders, "Damn, I feel tough." Within five minutes thereafter he suddenly collapsed, and fell to the ground. Death was instantaneous.

The referee found, as did the whole commission on review, that there was an accident; that the accident arose out of and in the course of the employment; that the accident caused the death of the deceased. The referee found the "work employee was doing and how accident happened" to be: "Standing on a wagon jacking lumber, when he suffered a heart attack and fell from the wagon, breaking his neck." The finding of the whole commission on that question omits any reference to a heart attack, and merely recites, "Standing on a wagon jacking lumber when he fell off wagon and broke his neck."

Reference is made to the opinions filed in the Court of Appeals for a more complete statement of the facts.

Aside from members of the immediate family, the claimants put on only two witnesses, the Coroner and the embalmer, and it is, in large measure, upon a construction of a portion of the Coroner's testimony that the claimants rely for an affirmance. The widow, a daughter and two sons of the deceased testified concerning his good health, and the total absence of any complaint or indication of heart disease on his part, and that on the morning in question when he left the house he appeared to be well and hearty.

Dr. Sigmund, the Coroner, is a chiropractor. He was called to the premises and saw the dead body of Seabaugh whom he had not known. Examination of the body after it was removed to the funeral home and the clothes taken off, revealed a broken neck. No autopsy was performed, and there was no examination of any internal organs of the body. This witness signed the death certificate in which he gave the cause of death as coronary occlusion, and also stated therein that deceased had a broken neck. In preparing the death certificate he stated he "had to go by the testimony that was given to me," and that it was his opinion deceased suffered a coronary occlusion and when he went down and rolled off the wagon he broke his neck when he hit the ground. He further testified that from his own examination he discovered a broken neck, but there were no other objective symptoms of illness or affliction which might have caused his death—"there was no clear indication of anything—that is, by looking at the body you couldn't absolutely tell." The witness was then asked, "Doctor, in your opinion, based on your objective examination of the body, was his death caused by a broken neck?" After an objection, and ruling thereon, the witness answered, "He had, in my opinion, he had a heart attack." The question was reframed a time or two, and finally the examination continued:

"Q. Could this broken neck which you found have caused his death?"

"A. That would put me on the spot—I'm not able to answer the full question.

".Q If a fellow has a broken back—sometimes they live and sometimes they die—isn't that right?

"A. It could have caused his death.

"Q. In other words, this broken neck which you found from your examination, could have caused his death?"

"A. That is true."

He further testified that when he placed "coronary occlusion" on the certificate of death as a cause of death he acted on testimony given to him by the witnesses, but that when he placed "broken neck" on the certificate he acted on his own investigation; that he had no way

of knowing professionally of prior existence of coronary occlusion. In this connection, the witness testified:

"Q. Can you testify positively that one—say coronary occlusion definitely and positively was the cause of his death, excluding everything else? A. Well, I don't guess I could under oath.

"Q. You are under oath. A. Yes."

The witness further testified that considering the testimony he had heard about the deceased's condition as to coronary occlusion, his working and living habits, his appetite and his weight and size, that a man in that condition could survive a coronary occlusion and could have a condition like that and still work; that he could have a condition like that and be alive when he fell from the wagon.

Further testimony by the witness was: "Supposing he had suffered from coronary occlusion as you testified in your opinion he did . . . and he fell from the wagon about three feet high . . . he was alive when he fell from the wagon and when he fell to the ground his neck was broken and he then died as soon as he hit the ground . . . in your opinion what was the actual cause of death? A. I don't believe I can answer that question.

"Q. . . . Suppose . . . you heard the testimony with regard to his working habits, his size and weight and so forth—you heard the testimony from numerous witnesses he had never complained of any heart trouble or pain—supposing that testimony is true and this man fell from the wagon, three feet from the ground, and broke his neck, and when you were called you found him dead and your objective examination revealed a broken neck—what, in your opinion would be the cause of his death?

. . . . . .

"A. From a hypothetical case the broken neck would be the cause."

Questioned by the referee, the witness testified that he found the neck of the deceased definitely broken; that it was in such condition that it could have caused the death; that he put coronary occlusion first on the certificate because it was his opinion that the deceased had a heart attack and rolled down off the wagon and broke his neck, and that it was his opinion that he was dead before he hit the ground, but that he could not say whether he died of a coronary occlusion or broken neck.

On cross-examination the coroner testified he had made a report as follows:

"I, Dr. J. F. Sigmund, Coroner of Cape Girardeau County, Missouri, duly from testimony gathered from the above witnesses, and after a careful examination of said body, do find that the deceased, Wiley Tom Seabaugh, came to his death as the result of a coronary occlusion, a natural cause. After the attack he fell off a lumber wagon—breaking his neck."

The witness further testified that he made a report to the Workmen's Compensation ▆ Commission wherein he stated: "In my opinion coronary occlusion was the cause of his death," and that such was still his opinion; that he was not testifying that coronary occlusion actually caused the death, but that that was his opinion.

The deposition of Glen Wilson, taken on behalf of the claimants, was introduced in evidence. Wilson testified that he was a licensed embalmer; that on February 19, 1944, he was called to the Seabaugh Funeral Home in Cape Girardeau to embalm the body of the deceased Seabaugh; that after he arrived at the Funeral Home, Dr. Sigmund came in and examined the body; that Dr. Sigmund took the deceased's head in one hand and had the other hand under the neck and turned the head and felt under there and said: "The man's neck is broken," and requested the witness to "feel under there," and that the witness put his finger on the back of deceased's neck, moved the head and felt a crunching of the bones at the back of the neck. He stated that in his opinion there was a broken bone in the neck; and further stated that he had never studied medicine and did not claim to be an expert in the matter of broken bones.

The foregoing was all the testimony introduced by claimants.

Clarence Sanders was called as a witness on behalf of the defendants, employer and insurer. The witness stated that he was thirty-three years old and that he was working for the Garver Lumber Manufacturing Company, having been so employed about fifteen years; that he was the only person working with the deceased at the time of his death; that just prior to Seabaugh's death he (the witness) was on top of the lumber stack and Seabaugh was standing on the wagon, which was about three feet high, jacking lumber; that Seabaugh's duty was to get the lumber up on the stack; that he did this by placing the boards on a jack in front of the stack, pulling the lumber back far enough to balance it so as to get the other end into the stack, and when the man on the stack would take hold of the upper end of the lumber the jacker would boost the lower end with one hand— the stacker would then pull it back and lay it straight. The witness stated that he had known Seabaugh and had worked with him off and on for about fifteen years; that during the time he had worked with him, he (Seabaugh) had complained to the witness of his left chest hurting him; that they had been in the woods sawing logs and timber together and that the witness had known Seabaugh to straighten up after pulling a cross-cut saw, beat on his side, and in a few seconds say, "allright, I'm ready to go back to work," and then they would go back to work. In this connection, the witness testified.

"Q. Did he ever make any statement about getting his heart to pumping again? A. Yes, sir, that was always his words—'wait till I get it pumping again.'

"Q. Did he ever do anything of that kind while working down at the mill or the yards? A. Occasionally, Yes."

The witness further testified that about five minutes before his death Seabaugh said: "Damn, I feel tough." At this point the witness was asked if he had ever noticed anything about Seabaugh's hands and arms and said that he had seen his hands turn white and the blood stop circulating and that Seabaugh would rub them and that they would do that the same in the summertime as in the winter, and he would rub them to get the blood circulating; that that had occurred about twelve months before Seabaugh died. The witness further testified that on the morning in question, just before Seabaugh's death, he, the witness, had hollored "sticks," which was the word for the stacker to holler to the jacker, and the jacker would then hand the stacker four 1x1's, and the stacker would lay them on the stack; and that Seabaugh just barely did get his hand down, like he was going to take hold of the sticks, "when he brought both his hands up to his chest (indicating) and started to fall gradually, and the farther he got the faster he fell." Continuing his testimony, the witness stated that Seabaugh fell sideways and made no effort to catch himself. The witness stated:

"I was down there when he hit the ground—I was there and had him in my arms—my foot prints were there where I jumped for I knew he was hurt—he was too fast a man on his feet to lay there that long—I knew him too well and knew his actions.

"Q. Did he breath any more? A. No, sir, there was kind of a gurgle in his throat like it had stopped up his breathing and that blood was coming out of his nose just like (indicating noise). . . . . Not very much—and after he lay there a while a small portion of blood came out of this eye (indicating). . . . I worked with him and tried to get him to come to, but after I knew he was dead I laid him down and called the other man.

．　　．　　．　　．　　．　　．　　．

"Q. Without attempting to give your opinion as a physician, just tell the Judge how he died—what you saw. A. Well, sir, he was dead when I picked him up in my arms—I thought it might have knocked the breath out of him—

"Q. You hit the ground about the same time he did? A. Yes, I knew he was hurt because I have worked with him enough to know his actions—because if he hadn't been hurt he would have made an effort to catch himself—he always was stout and quick on his feet.

"Q. He made no effort to catch himself? A. No, sir, none whatsoever. When I picked him up I worked with him on his chest—that is the first thing I did—his hands lay clasped on his chest and I pushed his hands down to work on his chest—that is the first thing I did to try and get him to come around and then I got my head down to listen to his heart and it seemed like it was two or three seconds

that the gargle of noise came from his nostrils and I saw the blood coming from his nose and eye—I never seen him take a breath and his heart was not beating when I had my head down to listen."

On cross-examination the witness testified that at the time Seabaugh made the statement "I feel tough," there was no indication from his appearance that he was in ill health; that he looked all right, and did his work all right; that the ground at the time was frozen. The witness also said that "the man was dead before he hit the ground"; that he knew that "because he never made any effort to catch himself."

Dr. William J. Sparhawk testified on behalf of the employer and insurer that on February 19, 1944, he was called to the Garver Lumber Manufacturing Company and found Tom Seabaugh lying on the ground; that there was no evidence of external injury on the body; that there was a spot or two of blood on the nostrils; that he made an examination to determine whether the man was dead or alive; that he took his stethoscope and listened to his heart, he felt his pulse, and listened to his lungs, and there was no action in any of them, and he figured that the man was dead. At this point the witness testified:

". . . there was no lack of neck rigidity—I'm speaking—you have been talking so much about the fracture of the spine here today, or the vertebrae and neck, and if that was present it would have been like this—the head would have been like this (indicating) over to one side—and it wasn't.

"Q. It was not? A. No, sir. I didn't examine the neck—the man was dead and I was there to render first-aid and there was no first-aid to be rendered.

"Referee Kinder: You didn't examine the neck? A. No, sir."

The witness further testified that he talked to several men there; that "my diagnosis of the cause of death was a heart condition . . ."

On cross-examination the witness was asked if he based his diagnosis entirely upon statements made by the workmen down there, and answered: "That is the way we make most of our diagnoses."

The witness further testified:

"Q. You didn't make a thorough examination of the body? A. I did not.

"Q. You didn't remove the clothing from his body? A. No, I did not.

"Q. I believe you testified the neck was not broken? A. There was no evidence of it.

"Q. But you didn't make a close examination to ascertain that? A. No.

"Q. Can you, as a physician, definitely and positively state what caused the man's death, if you heard the testimony, if he ▇▇▇ slumped . in the wagon and fell to the ground and suffered a broken neck and he was dead upon your arrival and you didn't make any examination of the internal organs—you merely made the examination you testified you did—can you definitely and positively state what caused the man's death? A. There are several different things that could have caused his death under the hypothetical question—just knowing that much, there are several things that could have caused it. . . . A broken neck could have caused it—if it was broken.

 · · · · ·

"Mr. Oliver (addressing witness) : It is your opinion this man died of heart trouble? A. That is my opinion.

"Q. (by Mr. Knehans) Your opinion was based upon what you were told? A. By what I saw and was told."

Dr. J. H. Cochran testified in behalf of the employer and insurer and was asked whether or not he was called to the Garver Lumber Company yard on the 19th of February, 1944, to view the body or render any aid to Tom Seabaugh. The witness answered: "No, sir, I was not." The witness was asked a hypothetical question which embodied the testimony of the witness Sanders concerning the happenings on the wagon on the morning in question, as well as the testimony of said witness and other witnesses concerning the actions and expressions of Seabaugh as to the condition of his health on occasions prior to said morning, including said witness's statement that Seabaugh was dead before he struck the ground, and also the testimony that at the funeral home one of the vertebrae of the spine of the deceased was broken, and including the opinion testimony in the hearing before the Commission given by Dr. Sigmund—that the deceased came to his death as the result of "coronary occlusion"—and that of Dr. Sparhawk that Seabaugh died of "heart failure," and also including the testimony of members of the deceased's family concerning the prior condition of Seabaugh's health. At the conclusion of said hypothetical statement, the witness was asked: "Q. From that state of facts, I will get you to state whether or not the deceased could have or probably did die of coronary occlusion or heart failure, or whether under those conditions it is more likely he died of a broken neck?" to which the witness answered: "A. I should say his death was due to acute heart failure, and in all probability due to a disease of the coronary artery."

The witness testified on cross-examination:

"Q. Then if this man was on a wagon, working on a lumber wagon, and had a heart attack and fell to the ground and his neck was broken in the fall, would there be any way of telling whether or not the heart attack killed him or that he was still alive when he

fell and broke his neck when he hit the ground? A. No, sir, unless a post-mortem examination had been made.

"Q. Is there any way to determine whether the man was still alive when he hit the ground and broke his neck? A. No, sir, but there is no evidence the man broke his neck when he hit the ground.

"Q. You have given it as your opinion that this man died of heart disease? A. Yes, sir.

"Q. At the same time you admit a man with this disease could live quite a while? A. A man may live for many years with the disease.

"Q. And he may suffer an attack and live? A. Yes, sir.

"Q. You have no way of knowing, of your own knowledge, or from the questions asked you, whether this man was alive or dead when he hit the ground, have you? A. No, sir."

The witness further testified that, based upon the information in his possession, there was absolutely no way for him to determine whether the man was dead when he hit the ground or not.

"Q. Under those circumstances, is it your opinion he died of heart disease? A. On the information given me, we have a man who had been suffering from the disease of the coronary arteries, based upon his past history. Based on that information, it is my opinion the man suffered an attack of coronary thrombosis.

. . . . . . .

"A. There is certain information presented to me in support of the fact the man suffered from the disease of the coronary arteries, and with that evidence, and nothing but presumptive evidence that the man had a broken neck, I give the opinion death was due to coronary thrombosis."

The witness further testified that he was still of the opinion that Seabaugh died of coronary thrombosis and that his opinion was based upon what Mr. Oliver (counsel for the employer and insurer) told him and the lack of evidence of a broken neck; that in giving his opinion he was ignoring the possibility of a broken neck.

"Q. Now, if there was no history of heart trouble, if this man never complained of pain in his chest, never complained of pain in the region of the heart, would your opinion with reference to the heart disease still be the same? A. In that case, my answer would be I wouldn't know what caused his death."

The Court of Appeals held the fall constituted an accident arising out of the employment, and that it was competent to disregard that portion of the coroner's testimony in which he expressed the opinion (based on evidence he heard in his official capacity) that coronary occlusion was the cause of death, and to accept his answer to a hypothetical question that the broken neck which he personally examined could have caused death. In reaching these conclusions the court applied the oft-cited rules governing the review of com-

pensation cases to the effect that the award has the force of a verdict of a jury, is to be viewed in the light most favorable to the award, and all reasonable inferences are to be drawn in support of it, and all evidence unfavorable to the award is to be disregarded. But these rules have been modified by the provisions of the Constitution of 1945; Art. V, Sec. 22, to the extent that we are of the opinion that the award is now to be regarded as having more nearly the force and effect of a judgment in a non-jury case under the new Civil Code, review of which is provided by Laws 1943, Sec. 114(d), p. 353, Sec. 847.114(d), Mo. R. S. A. The constitutional provision is that judicial review of decisions' of administrative bodies "shall include . . . in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record." As was said in the recent case of Wood v. Wagner Electric Co., 197 S. W. 2d 647, it is not meant that under the new procedure "the reviewing court may substitute its own judgment on the evidence for that of the administrative tribunal. But it does authorize it to decide whether such tribunal could have reasonably made its findings, and reached its result, upon consideration *of all of the* evidence before it; and to set aside decisions clearly contrary to the over-whelming weight of the evidence. Of course, the reviewing court should adhere to the rule of deference to findings, involving credibility of witnesses, made by those before whom the witnesses gave oral testimony."

█ Sec. 3691 R. S. '39 and Mo. R. S. A., prohibits construction of the terms "injury" and "personal injuries", as used therein, to "include death due to natural causes occurring while the workman is at work." And the burden is on the party claiming compensation to show that the death or injuries resulting from an accident within the meaning of that term as defined by statute. See DeLille v. Holton-Seelye Co., 334 Mo. 464, 66 S. W. 2d 834, 836, where, also, the following from Doughton v. Marland Refining Co., 331 Mo. 280, 53 S. W. 2d 236, 241, was cited with approval: "It is true there was other expert evidence from which it could be found that the injury, if deceased received one, was the immediate cause of his death, *but it is not sufficient for recovery to show that the injury or death complained of resulted from one or the other of two causes for one of which, but not the other, the defendant would be liable.* The plaintiff must produce evidence from which it may reasonably be found that such injury or death resulted from the cause for which the defendant would be liable." See, also, Adelsberger v. Sheehy, 332 Mo. 954, 957, 59 S. W. 2d 644, and cases therein cited.

█ █ The evidence upon which the claimants rely as reasonably showing that the death resulted from the cause for which the appellants would be liable, the broken neck, is found in the answers of the coroner to the hypothetical questions hereinabove set out, as

to whether the broken neck would or could produce death—questions, incidentally, which omit consideration of the manner of the fall. Under such cases as Gillick v. Fruin-Colnon Construction Co., 334 Mo. 135, 65 S. W. 2d 927, and Kimmie v. Terminal, 334 Mo. 596, 66 S. W. 2d 561, such answers are not to be regarded as constituting substantial evidence that the death of Seabaugh did, in fact, result from the broken neck. On the contrary, the doctor was all the while insisting that, in his opinion, the death was from another and different cause.

On the whole record, we hold that respondents' proof was insufficient to reasonably show that Seabaugh's death resulted from a cause for which appellants would be liable, and it extended no further than showing two causes, "for one of which, but not the other, the defendants would be liable." The award should therefore be, and it is, reversed. All concur, except *Conkling, J.*, not sitting because not a member of Court when cause was submitted.

PER CURIAM:—That portion of the opinion of the St. Louis Court of Appeals (193 S. W. 2d, 370, 371) overruling respondents' motion to dismiss which we adopted as our own should be expanded and explained so as to remove doubt and uncertainty as to the effect, under the new Civil Code, of the filing of a motion for new trial in workmen's compensation and other cases where such motion is not required to preserve matters for appellate review, as follows:

■ No motion for new trial is necessary to preserve for appellate review the question of the sufficiency of the evidence to support the award (which is usually the only question presented) in a workmen's compensation case. This is true for two reasons: (1) The entire record before the Commission was considered record proper under the old code and would, therefore, be preserved without any motion for new trial [J. M. Farrin & Co. v. Murphy, 351 Mo. 77, 171 S. W. (2d) 668; State ex rel. May Dept. Stores v. Haid, 327 Mo. 567, 38 S. W. (2d) 44]; and (2) because the new code provides that, in non-jury cases, "the question of the sufficiency of the evidence to support the judgment may be raised whether or not the question was raised in the trial court." [Sec. 114d Civil Code, Laws 1943, p. 387; Sec. 847.114d Mo. Stat. Ann. construed as applicable to review of administrative tribunals in Peerless Fixture Co. v. Keitel, 355 Mo. 144, 195 S. W. (2d) 449.] Therefore, when no motion is filed, the judgment becomes final under Rule 3.24 "at the expiration of thirty days after the entry of such judgment."

■ However, if a motion for a new trial is filed, it has the same effect (in a compensation case as in any other) to postpone the finality of the judgment until overruled or until 90 days after it is filed. [Sec. 118 Civil Code, Laws 1943, p. 389; Sec. 847.118 Mo. Stat. Ann.] The real purpose for filing such a motion would be to obtain relief in the trial court; and we have held that it may be properly

filed for that purpose in a case decided solely on the pleadings, a record proper case in which such a motion had no effect under the old code. [Gerber v. Schutte Investment Co., 354 Mo. 1246, 194 S. W. (2d) 25.] It would postpone the finality of the judgment in a workmen's compensation case because a motion for a new trial is one of the authorized motions referred to in Rule 3.24 (which postpones the finality of the judgment) in such a case. This is true because Sec. 120, Civil Code (Laws 1943, p. 389, Sec. 847.120) makes a motion for new trial a proper motion in every case. It does this by abolishing all of the old record proper motions and providing that "the objections which were heretofore made on such motions may be raised in a motion for new trial." Thus a motion for new trial under the new code is no longer a motion for raising only what were formerly matters ██ of exception. On the contrary, it is now a motion which covers the whole record.

██ Section 120 was one of several sections put into the new code for the purpose of abolishing the old distinctions between the record proper and exceptions. Others are Sec. 122 (Sec. 847.122 Mo. Stat. Ann.) abolishing formal exceptions; Sec. 125 (Sec. 847.125 Mo. Stat. Ann.) abolishing writs of error and providing that an appeal "shall constitute a continuation of the proceeding in the trial court"; and Sec. 140a (Sec. 847.140a Mo. Stat Ann.) saying "no allegations of error shall be considered" on appeal rather than "no exceptions shall be taken" as did Sec. 1227, R. S. 1939, Mo. Stat Ann. (which it replaced) in stating what must be presented to the trial court in order to be preserved for appellate review. Even under the old code we held that a record proper motion (arrest of judgment) prevented the judgment from becoming final until it was overruled. [Williams v. Pemiscot County, 345 Mo. 415, 133 S. W. (2d) 417.] Therefore, there can be no doubt that a motion for a new trial is an authorized motion in any kind of case, and has the same effect to postpone the finality of the judgment in any case, because under the new code it performs not only all of its former functions as a motion for new trial but also those of all former record proper motions as well.

██ In this case, a motion for new trial was timely filed, within ten days after entry of judgment, which would have prevented the judgment from becoming final. However, it was overruled only 28 days after entry of judgment which was less than the time in which the judgment would have become final if no motion had been filed. Certainly it was proper to file a notice of appeal as soon as this motion for new trial was overruled or at any time within 10 days thereafter. Since the new code has changed the rule as to workmen's compensation cases, stated in J. M. Farrin & Co. v. Murphy, supra and State ex rel. May Dept. Store v. Haid, supra, (that a motion for new trial was not an authorized motion in a workmen's compensation case, or other administrative tribunal review cases, served no purpose therein and

did not postpone the finality of such judgment) we think the reasonable construction of the new procedure is that it is possible either to speed up the time of taking appeals (by a prompt filing of and ruling on a motion for new trial or to postpone the time therefor (until the motion is ruled), up to the full 90 days after motion for new trial is filed, as in other cases. In short, we now have exactly. the same procedure and the same rules in all cases in which a motion for a new trial is filed. Undoubtedly this was the purpose of the new code, and Rule 3.24 construing it, in order to avoid the confusing situation prevailing under the old procedure, which caused parties to lose rights of appeal because a motion for new trial had the effect to postpone the finality of the judgment in some types of cases while such a motion had no function or effect at all in others.