[1] This is an appeal from a judgment of the circuit court of Jasper County, reversing an award of the Industrial Commission. After a hearing, the Referee had awarded Clifford Starchman, the employee, compensation at $20.00 per week for thirty five and two-sevenths weeks for "temporary total disability" and found that there was no probable future disability. This was affirmed by the Industrial Commission, Judge Lahey dissenting, and upon appeal to the circuit court, that court found that there was no substantial evidence to support the findings of the Industrial Commission and the cause was remanded for further proceedings.
[2] Clifford Starchman was an employee of the Kansas Explorations, Inc., and was 22 years of age. He was injured May 15, 1945 while assisting two other persons in replacing a can and car on a track in a drift of the mines of the employer. He had also been injured in October, 1944, and had been paid compensation by the same employer from October 2, 1944 to March 12, 1945. He testified that his foot slipped while assisting the others in lifting the can and car, which caused him to violently sit down, after which he had terrific pains in his hip and pelvis. He was immediately taken by the timekeeper of the employer to Dr. Kiblinger, whom, he testified, was a chiropractor or osteopath, but not a medical doctor. For seven weeks or two months excluding Sundays, he took daily treatments from this doctor, who "laid me on my stomach and pushed around on my back and worked my back around and poked my legs and popped my back, and give me this light treatment. And popped my legs." At the end of this series of treatment, the doctor told him he could do nothing further for him and would return him to the employer. He was then sent to a Dr. DeTar by employer's attorney. Dr. DeTar examined him but did not treat him. Starchman then went to Dr. Campbell in Kansas City, who examined him and sent him back to the Joplin hospital where he was placed in a contraption designated as a "Bradford Frame", and the use of which was intended to relieve pain, and eventually cure his alleged injury. He was there under the care of Dr. Chenoweth. After three days and nights, Clifford refused to permit further continuance of this treatment because of the pain he suffered while taking it. He got up, dressed and went home without permission. He later went back to Dr. DeTar who recommended he go back to the hospital and take the treatments again and he refused to do so. He testified that since the injury to the date of the hearing, which was March 19, 1946, he had been unable to do any work at all, not even to do chores around the house. He admitted having signed a statement in the office of Mr. Wise, counsel for employer, in which he stated that when he lifted the can, "I felt a sudden pain across the small of my back" and "I told the other men I hurt my back, so I sat down for a while."
[3] On cross-examination, he denied having a garage out where he lived but admitted there was a barn on the premises. He admitted climbing upon a roof to show his brother how to fix the roof. His brother's nickname was "Frog" and his was "Cedar." He denied nailing any boards or shingles on the roof. He was wearing a blue khaki suit on January 18, 1946, the time he was on the roof. He denied carrying any tar paper or shingles to the roof. Starchman admitted he had been placed in 4-F by the draft board so he could take care of his cattle and help his mother. He specifically declared that on January 18, 1946, he had been at home all day and had done nothing whatever except get upon the roof once and go to the mail box a few yards from his house.
[4] Dr. James R. Elliot, a physician and surgeon specializing in bone and joint surgery examined him once, which was on January *Page 356 
14, 1946. He testified that from his examination, he felt that the employee had quite a disability but didn't think it would be permanent. The Doctor was of the opinion that Starchman would have been lots better off if he had continued the treatments at the hospital. He would assume that it would be entirely reasonable to suppose that Starchman would have some permanent disability with proper treatment.
[5] Dr. George K. Campbell examined him on June 29, 1945 and again on January 15, 1946, and his conclusions after the last examination were that he could do light work and had a ten to fifteen percent permanent partial disability of the back. This was based largely on subjective symptoms. His condition had definitely improved since his first examination. The Doctor testified: "I felt that he would be able to do light to moderate work at the time I last examined him," and his condition at the last examination is "about what is the result of failure to take proper treatment." Under proper treatment, "We usually get the patient back to work in about five to six weeks."
[6] Dr. W. W. Hurst examined the employee December 4, 1945 and testified that he had a traumatic rupture of the inter-vertebral disc between the last lumbar vertebra and the first sacral segment of the spine and at the time of the examination was unable to work and the disability was permanent. The doctor didn't think that Starchman's refusal to take further hospital treatments would hinder or delay his recovery. The conclusion that Starchman had a ruptured disc was arrived at by the patient's own statements making the case history, which is accepted one hundred percent.
[7] Dr. E. Ernest Johnson, Jr., a medical doctor, testified that he examined the employee September 18, 1945 and his opinion from the examination was that there was a limitation of motion on bending his back for ward. He could only bend forward to an angle of 45 degrees without eliciting pain in the lumbosacral area. It was also the Doctor's opinion that this man had a painful back and would not be able to do normal labor for some time.
[8] Orin M. Watson was an investigator for the employer. He visited the residence of the employee on January 18, 1946, arriving there at approximately 10:30 a. m. He observed two men working on a garage, one was on the ground and one on the roof. The one on the roof was the employee, Clifford Starchman. He was receiving pieces of lumber from the man on the ground, laying them in place on the roof of the garage and nailing them down. The man on the ground was handing up the boards. The boards were approximately one inch by 8 inches and 9 or 10 feet long. The man on the ground would pick these boards up and lean them against the garage, sliding them up onto the roof, where Clifford would receive each board, lift it up, swing it around into position and nail it. While doing so he was in various positions, he would kneel on one knee, sometimes on both knees, sometimes facing down the roof and sometimes up. The roof was at an angle of approximately 45 degrees. The witness went over and asked the man on the ground if his name was Starchman and he said it was, and witness asked him where he could find Clifford Starchman. The man on the ground nodded to the one on the roof, and he said, "What can I do for you?" Witness asked him if he was Clifford Starchman and he said that he was. Witness told him that he was looking for a Starchman who lived near Tipton Ford and ran a grocery store. Meanwhile, the man on the ground referred to the one on the roof as "Cedar". Witness watched him work for a few minutes, then left and went back to Joplin, where he picked up a friend named Russell Everett and drove back to a point near the residence of employee, arriving there at approximately 11:15 a.m. They parked their car to the north of O'Dell's store and off the highway and watched the two men work until approximately 12:30. They were putting green shingles on the roof. At about 12:30, the employee came down off the garage, walked down with his back to the ladder and approximately four feet from the ground, jumped to the ground and then went into the house. He stayed in the house approximately seven minutes, *Page 357 
came back out, picked up a bundle of roofing shingles, carried them up the ladder to the roof. The bundle was about 24 inches long and was bound together. He started nailing them on, part of the time he would kneel or squat as he worked, sometimes facing up the roof and sometimes facing down. The witnesses watched him work for about an hour and fifteen minutes or an hour and a half. They left about 12:35, and went to Joplin for lunch. The witness returned alone about 1:15 and the men at that time were working on the east side of the garage. They were laying shingles on that side, both of them were working. He watched them again for about an hour and left about 2:30. They were still working on the roof when he left.
[9] Russell W. Everett testified that on January 18, 1946, he went to the Starchman residence with witness Watson and that near that residence were two men working on a garage, roofing it, with what looked like tar-paper combination roofing, which looked like it might be cut "on an eight by twelve piece." One man was on the roof and one on the ground. The one on the roof was the employee and the other on the ground was his brother and he was handing boards and roofing up to the employee, who would pick them up at the edge of the roof and carry them up the roof and lay them down. He was nailing the boards on the roof and also the shingles or roof covering. Witness was about fifty feet from them when he went by in the car and he parked about one-fourth or one-half block from them. He got there between 11:15 and 11:30 and left about 12:30 to 12:35 and these two men were working the majority of the time. He not only saw the employee nailing the boards on the roof and nailing the shingles, but saw him go up and down the ladder and work on the roof. He was in "a squatted down position, both down the roof and up the roof." One time when he came down the ladder and when he got close to the bottom, he either missed the bottom step or jumped to the ground. He went around the garage and was gone a while, then came back and went to work. Witness saw him carry shingles up onto the roof. He didn't come down the ladder with his back to it.
[10] On rebuttal, Clifford testified that he was on the roof between 10 and 11 a. m. on the 18th of January, that he was not taking up the boards or shingles and that they were not using shingles but tar paper. He denied going down the ladder with his back to it and jumping off, and stated that the garage belonged to a Mrs. Sparling. His brother, Loran, had the job of putting the roof on the garage. When Watson came up he was on the ground and his brother was on the roof. He only saw Watson once and that was when they had the conversation about a Starchman at Tipton Ford. He admitted, on cross-examination, he had had another accident in October 1944, for which he had filed a claim but that claim had never been settled. It was still pending before the Industrial Commission.
[11] Ora Sparling testified that she was the owner of the garage and she hired Loran Starchman to put a roof on it. That she did not employ Clifford Starchman, that the roof was green tar paper, all in one roll. She was at home when the roof was put on and denied that any boards were nailed on the roof that day; she testified that the garage had been built by her son who put on the sheeting before he went back to school. She then testified that there might have been two little short boards put on by Loran Starchman, she didn't know whether the employee worked on the roof or not.
[12] Loran Starchman testified that he was working on the roof, putting on green, slate tar paper the morning that witness Watson came out there. He stated that he had asked Clifford, the employee, if he was putting the roof on right. He stated when Watson came, he was on the ground. He admitted that he nailed two or three pieces of sheeting on but denied that Clifford got upon the roof of the garage and nailed a bunch of sheeting on. He also denied that he handed boards up to Clifford and stated if he remembered right, that Clifford was there the second time that Watson came back but there was no other person with him when he came; that Clifford got upon the roof one time (he believed) but did not *Page 358 
nail any shingles, and that Clifford carried no tar paper upon the roof.
[13] Betty Jean Starchman, wife of employee, testified that Clifford had not been able to work since his injury, that she was home on the day the roof was put on the garage, that she could see the garage plainly from the house, and that it was not over a block away. That Clifford didn't do any work on the garage and that it was being covered with tar paper, of a green shade, by Loran Starchman. On cross-examination, she admitted there was a house between her house and the garage but she asserted she could see the garage plainly, that she was usually out in the yard but she didn't watch the garage. She didn't see Clifford working and didn't know for sure whether he worked.
[14] Ethel Starchman, the mother of the employee, testified she lived about a block south of the Sparling house where Clifford lived. That the garage was covered with roll roofing "it has a shingle and then a roll of tar paper," that it was put on by Loran Starchman and Clifford had nothing to do with it. She testified on cross-examination that she didn't know of her own knowledge whether Clifford worked or not but that he wasn't able to work.
[15] At the close of the testimony of this witness, the following occurred:
[16] Mr. Foulke: Now if the Referee please, the defendant here, the employer, has brought two witnesses in here in an effort to prove that this young man was working out there, and that he was lifting big bundles of shingles and nailing boards on the roof of this garage. It is a manifest untruth, because the garage is covered with rolls of tar paper and there are no shingles around there at all. And I would like to take this Referee and Mr. Wise out and show you that garage, thereby establishing beyond any doubt that these witnesses have come on this stand here yesterday and lied to this court. Now, I think I am entitled to that, in view of this case.
[17] "The Referee: Will you go out with him, Mr. Wise?
[18] "Mr. Wise: I don't have time to go out there, myself. However, I will admit, if it will shorten the record, that there is tar paper on there. I don't know, these follows might have been mistaken.
[19] "The Referee: I think that is all the record needs. He admits it was tar paper rolls.
[20] "Mr. Wise. I haven't been out there to see.
[21] "Mr. Foulke: Will you admit that they have told a lie?
[22] "Mr. Wise: Of course I won't admit that; for all I know, your witnesses have been telling a lie.
[23] "The Referee: I think it is the Referee's province to decide what portion of the testimony is false and what is true, and Mr. Wise ought not to be expected to admit it. It will be submitted on the credibility of the witnesses as it stands. A great many witnesses show a deep interest in the case."
[24] We have set forth the evidence in this case somewhat in detail because if the finding of the Industrial Commission was supported by competent and substantial evidence upon the whole record, neither the trial court nor we have any constitutional or statutory authority to reject it. Wood v. Wagner Elec. Corp. et al., 355 Mo. 670, 197 S.W.2d 647.
[25] Section 3732, R.S.Mo. 1939, Mo.R.S.A., provides that the circuit court on appeal may reverse or remand for hearing the findings of the Industrial Commission when it finds from an examination of the record (among other reasons not important here): "4. That there was not sufficient competent evidence in the record to warrant the making of the award."
[26] This section also provides: "Upon appeal * * * the findings of fact made by the commission within its powers shall be conclusive and binding."
[27] In discussing the relative constitutional and statutory provisions, the Supreme Court in Wood v. Wagner Elec. Corp. et al., supra, said [355 Mo. 670, 197 S.W.2d 649]: "This does not mean that the reviewing court may substitute its own judgment on the evidence for that of the administrative tribunal. But it does authorize it to decide whether such tribunal could have reasonably made its findings, *Page 359 
and reached its result, upon consideration of all of the evidence before it; and to set aside decisions clearly contrary to the overwhelming weight of the evidence. Of course, the reviewing court should adhere to the rule of deference to findings, involving credibility of witnesses, made by those before whom the witnesses gave oral testimony."
[28] This declaration has been followed in Seabaughs Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55. Karch v. Empire Dist. Electric, Mo.Sup., 218 S.W.2d 765. Crawford v. A. J. Sheaham Granite Co. et al., Mo.App., 211 S.W.2d 52. LaForge v. Coglizer Tent Awning Co., Mo.App., 205 S.W.2d 957. Vogt v. Lambert Pharmacal Co. et al., Mo.App., 218 S.W.2d 788, and other cases.
[29] Neither the employer nor the employee is objecting to the allowance of $20.00 per week for 35 and 2/7 weeks. The employee objects to the finding that there will be no future disability. As stated in the employee's argument: "All the evidence shows that the claimant was in need of additional medical, surgical and hospital treatment to cure and relieve him from the effects of his injuries, and the award should have been a temporary award only providing for compensation during his temporary total disability and directing the employer and insurer to furnish him with the medical, surgical and hospital treatment."
[30] So the issue narrows down to whether the Commission could have reasonably found, upon competent and substantial evidence upon the record that the employee had recovered on the 18th day of January, 1946 to such an extent that there would be no future disability.
[31] It seems that the 35 and 2/`7 weeks for which compensation was allowed on a "temporary total disability" is the exact period of time between the date of the accident and the 18th day of January, when the two witnesses visited the Starchman residence and saw him (so they testified and which testimony the Referee undoubtedly believed) working on the garage. The Referee and the Commission evidently believed from that testimony that Clifford Starchman was fully recovered from any injury that he had received.
[32] One of these witnesses was a hired investigator of employer. It is urged that this fact reflects on the accuracy of his testimony. He was corroborated in many essential matters by witness Everett, who was not such an employee. Were the doctors, when examining the employee and testifying in person and by deposition, acting purely from charitable motives? Our experience does not lead us to believe so and the record does not so show. Was the wife, mother, brother and landlady of the employee entirely without bias in giving their testimony?
[33] It is true that some of the physicians testified that in their opinion Starchman would have some future disability but the Commission undoubtedly considered the fact that these prognoses were largely based upon subjective symptoms, that is, upon statements of fact and complaints by the employee, See LaForge v. Coglizer Tent and Awning Co. supra, 205 S.W.2d loc. cit. 962, which as one of the physicians indicated, were accepted one hundred percent in making a diagnosis.
[34] Some of the doctors also admitted that their prognoses in cases of this character were somewhat speculative. One of the doctors had examined the employee in September, 1945 and another the 4th of December, 1945.
[35] Considering the facts testified to by witnesses Watson and Everett, we are not prepared to say that the decision of the Industrial Commission was clearly contrary to the overwhelming weight of the evidence. We must not substitute our judgment for theirs under these facts. The Referee before whom the case was tried and whose record we now review stated at the hearing, "it (the cause) will be submitted on the credibility of the witnesses as it stands. A great many witnesses show a deep interest in the case." As we view it, he was in a better position than any one connected with this case to pass upon the credibility of the witnesses and the weight and value of their testimony. The hearing lasted two days and the employee testified *Page 360 
each day. The Referee not only heard his testimony but had an opportunity to observe him while testifying and during the trial. His award upon review became the award of the Commission and we believe it was supported by sufficient competent evidence upon the whole record. Under this view of the case, the judgment of the trial court should be reversed, and a judgment entered sustaining the Commission. It is so ordered.
[36] BLAIR and McDOWELL, JJ., concur.