261 S.W.2d 512 (1953)
POWERS
v.
UNIVERSAL ATLAS CEMENT CO.
Nos. 28706, 28710.
St. Louis Court of Appeals. Missouri.
October 20, 1953.
*514 Fuller, Ely & Hibbard, Elgin T. Fuller, Roger Hibbard, Hannibal, for appellant-respondent.
Roy Hamlin, Hannibal, for respondent-appellant.
HOUSER, Commissioner.
This workmen's compensation claim was brought by Ace Powers, employee, against Universal Atlas Cement Company, employer and self-insurer, for total and permanent disability caused by an alleged accident which he claimed immediately produced a disabling heart attack. Employer denied that claimant sustained an accident or received any internal injuries and asserted that he suffered a heart attack in no way associated with his work and which neither arose out of nor was the result of an accident.
A referee found that claimant sustained an accidental injury on January 1, 1950, which arose out of and in the course of his employment and awarded claimant temporary total disability of $25 per week from January 1, 1950 so long as the disability should continue, until June 1, 1952, at which time the cause was to be reset for further hearing. Employer having failed to pay the compensation and the medical and hospital bills awarded, employee in June, 1952 filed a request that the award be doubled, under section 287.510, RSMo 1949, V.A.M.S. On rehearing the Industrial Commission found that claimant's heart was injured and that he suffered permanent total disability as the result of an accident which arose out of and in the course of his employment; that a "Hand brake of coal car slipped or jerked, throwing employee against said car," and made a final award for permanent total disability in the sum of $25 per week during the first 300 weeks of disability and thereafter the sum of $14 per week for life and awarded for medical aid the sum of $483.50. Employer appealed to the circuit court, as did employee, the commission having failed to double the award in accordance with employee's request. The circuit court affirmed the award of the Industrial Commission, whereupon both employer and employee appealed to this court, which has jurisdiction for the reason that the amount in dispute cannot be determined definitely. Platies v. Theodorow Bakery Co., 334 Mo. 508, 66 S. W.2d 147. The judgment is contingent upon the continuance of the life of the claimant, and therefore this court, and not the Supreme Court, has jurisdiction even though the claimant, upon affirmance, might eventually receive more than $7,500 under the judgment. Hardt v. City Ice & Fuel Co., 340 Mo. 721, 102 S.W.2d 592.
Employer admitted that Ace Powers on January 1, 1950 was its employee, that it was operating under the compensation law, and that on that date employee suffered a heart attack described as an acute coronary infarction, which resulted in total and permanent disability. The only question raised on employer's appeal is whether the award of the Industrial Commission is supported by competent and substantial evidence. Employer asserts that it is not; that employee did not sustain an accident; that the heart attack was not the result of an accident; that the award is against the *515 overwhelming weight of the evidence; that claimant's version of the alleged accident is opposed to physical laws, unbelievable, and not entitled to credit; and that this court should not defer to the finding of the referee, but should decide the case in accordance with what appears to the court to be just and right.
In its operations employer used coal, which was brought to its premises in railroad cars. The cars were spotted on a siding, the tracks of which were laid on a 1 or 2% incline. As coal was needed the cars were released, one by one, and would roll by force of gravity to a point on the tracks over open coal chutes, into which the coal was discharged through doors which opened in the bottom of the cars, thus permitting the coal to drop into the chutes. To move the cars it was necessary for one man to ride on the car to operate its hand brakes, and another, using a jack, to "jack the car" down the track. The hand brake wheel was mounted in a vertical plane on the end of the car in question. The wheel, approximately 24 inches in diameter, was located about 9 or 10 feet above ground level. To be in a position to operate it a man was required to climb up a ladder of grab irons attached to the end of the car, then step onto a steel platform located 2½ or 3 feet below the wheel. The platform was 10 or 12 inches wide and 30 to 36 inches long. To apply the brakes the operator stood on the platform and rotated the wheel clockwise. The rotation of the wheel caused one end of a chain to wrap around the shaft to which the wheel was attached. The other end of the chain was attached to rods and levers in such a manner that when the wheel was rotated clockwise the resulting tension applied the brake shoes to the wheels of the railroad car.
Claimant's version of the facts: Claimant and an employee named Dick Crain moved the loaded coal car in question possibly 100 feet to the position over the hopper. In doing so claimant got up on the car and released the brakes by turning down the "dog" or catch on the wheel, and Crain started the car rolling by the use of the car jack. Claimant "tightened the wheel back up" to get tension on it and Crain "pinched" the car along. The brake was partially "on" as the car went down the slight incline. The car went very slowly. Crain walked ahead of the car. Claimant stood on the brake wheel platform at the rear of the car, with his left foot extended about 2 or 2½ feet in front of his right foot. Claimant was facing the side of the brake wheel, and not facing the end of the car. The car was a "couple of feet" to claimant's left, so that his side and not his back was toward the end of the car. When the car was 4 or 5 feet from the place where claimant intended to stop the car, something happened. Claimant took hold of the lower part of the brake wheel with both hands and pulled up on it. He was pulling on the brake wheel with all his might to stop the car, pulling upward toward his body when the brake slipped, the brake wheel jerked and slipped, the wheel released "real quick" and threw claimant 2 or 3 feet or more into and against the end of the car. He fell over to the left. His left arm and left shoulder fell against the end of the car. He did not fall off the brake platform. Claimant never lost his footing until the brake slipped and he was thrown against the end of the car. He had a real severe pain in his chest. He climbed down off the car and Dick Crain told him to "go over there and sit down." He was "paining so bad" he could hardly get his breath. He tried to sit down but was hurting so badly he could not do so. He lay over a banister. On account of the pain he had to get down from the banister. He went to the change room to change his clothes, and sent Dick Crain to see about getting the shift foreman, Mr. Sutton, to take him to town quickly, saying "I have hurt myself inside. I am having an awful bad pain." He told Dick Crain that the brake wheel had slipped. He stood up to change his clothes. He could not sit down or squat to do that. He could not walk under his own power. Mr. Sutton, shift foreman, summoned a company truck and employee Conn took claimant to the hospital. Claimant told Sutton about having a pain in his chest. He was positive that he told Sutton about the brake wheel slipping, *516 told him what had happened as nearly as he couldthat he was hurt on the brake and that it had slipped and thrown him into the car. Dr. Robert J. Lanning treated claimant at the hospital, where he stayed 7 days. He was then transferred to a veterans' hospital in St. Louis, where he stayed 53 days. Since the date of the accident he has not done any work of any kind and has been completely disabled. Claimant told the doctor at the veterans' hospital about the accident with the car brake. Claimant had a bruise on his shoulder and on the side of his chest following the accident but the skin was not broken or lacerated. The bruise was "on the muscle, on the outside of" his arm, shoulder and arm, the top of his chest. Claimant never before in his life had a pain in his chest like that experienced on the night of January 1, 1950; had never had any pain in his chest at all upon exertion in working. The condition of the brake shoe has something to do with the way the brakes apply. They will grab and slip if the brake shoe is worn out.
Employer's version of the facts: On the night in question James Wheeler and David Porter were new on the job. Neither knew how to "let an empty car down." Claimant, Wheeler and Porter were the only persons around the car in question. Dick Crain was not assisting claimant at the time but was working elsewhere on employer's premises. Crain had nothing to do with jacking, moving or starting the coal car in question or any other car that evening. Wheeler and claimant were the ones who brought the car down. Claimant rode the car, stationed on the rear end in charge of the brake wheel. Wheeler started the car with a jack, then went down to the hopper and when the car arrived hollered to claimant "to tell him the right place to stop the car." Claimant stopped the car where Wheeler told him to stop. After the car was stopped Wheeler put a block of wood or chock in front of the wheel of the coal car, and claimant came around the car to Wheeler. Claimant took a sledge hammer, "hit up on there and knocked the dog" and showed Wheeler how to open the doors on the coal car so that it would discharge its contents into the hopper. Claimant did not tell Wheeler about having a pain in his chest, nor did he say a word to Wheeler, Porter or Crain about any unusual occurrence of any kind or experience he had in stopping the coal car, such as the brake wheel slipping or turning and throwing him into the end of the car. After showing Wheeler how to open the doors, claimant "wasn't there very long" and Wheeler did not see him any more that night, although Wheeler learned later that night that claimant had been taken to the hospital. Porter was down in the hopper at the time the car was brought down by claimant and Wheeler, and was not in a position to see anything that was done by claimant or Wheeler. Crain saw claimant when he came into the change room. At that time claimant told Crain that a pain had hit him in the chest while he was letting the car down. Later claimant wanted Crain to get the shift foreman to send him to town. Crain told Sutton to get the truck to take claimant to town. As claimant walked from the change room to the truck he "acted like he was in bad shape." When Sutton first saw him, claimant was sitting on a bench in the change room with his head in his hands. Claimant said he was sick and that a pain had hit him in the chest and went up through his left shoulder. He was sick at his stomach, nauseated, and had a hard time breathing. He was "feeling pretty low." First he wanted to go home, then he wanted a doctor, then he consented to go to a hospital. Sutton called the hospital and arranged for a doctor to meet him there. Terrell Conn drove claimant to the hospital in the truck. On the trip claimant's condition was "pretty low" and alarming. He was in terrible pain, a very sick man. He leaned against the dash and groaned considerably. Conn asked claimant if he was sick or had been hurt and claimant answered "I don't know, boy, there is something bad wrong with me." Claimant instructed Conn to notify his son and wife, and "have her come to the hospital right away." The coal car involved was No. 871645 of the New York Central Railroad Company, a car which was acquired *517 in November, 1949 as a new car, equipped with a W. H. Miner vertical wheel type hand brake. No repairs had been made on the hand brake or on any of its connections from the time the car was acquired to the date of the hearing. The designer of the brake testified that it is mechanically impossible for the brake to slip in making an application. The chain cannot overlap because there is not quite one complete revolution of the chain drum before the brake shoes are set on the car, i. e. from full release to full application the drum does not make quite a complete revolution. It is not a pinion and gear mechanism in which the braking load is held by means of a dog or ratchet (in which mechanism the brake will unwind immediately upon letting go of the wheel if the ratchet and tooth are not in place) but is a worm-gear mechanism, which is different, and is so constructed that the angle of the worm is less than the slipping angle, as a result of which any pressure on the chain pulling downward cannot rotate the wheel backwards because of the mechanical ratio between the worm and the worm-gear. No force on the chain can make the wheel slip. To release the brake one turns it backwards counterclockwise and it will stay in any position to which you turn it because it is self-locking in all positions. That is a gradual release. The other method is by means of a release handle which accomplishes full and instant release of all the brakes without turning the wheel in any way. Employer introduced a number of photographs of the mechanism on car No. 871645, together with portions of the deposition of claimant in which he testified as follows:
"Q. Were there any bruises on your body after this occurred? A. None that I know of that I could see" and "A. The car moved about 12 or 15 inches after this pain struck me.
"Q. Were you able to get the wheel tightened prior to that time? A. No, I stopped the car.
"Q. You didn't tighten it after it slipped? A. No, sir, I didn't. * * * The two Negro men were not there when I got down off the car. I did not see either of them."
Medical evidence:
Claimant's Dr. John M. Canella testified that claimant is suffering from the result of an acute coronary infarction which is of a permanent nature; that coronary infarction can be precipitated by any exertion, whether it is mowing the lawn or digging a ditch or anything; that testimony that claimant, 250 pounds in weight, was stooped over, had hold of a wheel on a coal car trying to put the brake on with great force when the brake slipped and threw him and the pain struck him instantly is typical of the picture of coronary infarction; that while a heart attack may overtake a person without undue or overexertion, overexertion is a definite precipitating cause of a heart attack; that the amount of external traumatic force necessary to cause heart disease or a coronary occlusion would depend upon how much damage the man has had prior to receiving the blow. If he had had no previous trouble you would expect the blow to be a severe one before it could cause coronary infarction or occlusion. For a blow to cause a coronary infarction one of the following three things would have to exist: (1) the laying down of plaques in an artery which has become degenerative; (2) syphilis; (3) functional or pre-existing heart disease.
Employer's Dr. Robert J. Lanning testified that he first saw claimant between 9 and 10 o'clock on the evening of January 1, 1950; that he was in shock and complained of severe pain in his chest, marked shortness of breath and his blood pressure was quite low. The doctor observed his arms, chest and body and noticed no kind of a bruise or mark on any part of his body. He examined his chest with a stethoscope and noticed no bruises, scratches or cuts. Claimant stated to Dr. Lanning that he was pulling on the brake or twisting it and had the pain in his chest. He at no time told the doctor about any bumping or hitting the side of a coal car. *518 Claimant's version was that while he was tightening the brake wheel he suddenly developed a severe pain in the chest. The diagnosis was acute coronary occlusion or myocardial infarction. Dr. Lanning's opinion was that the condition he observed in claimant was not the result of any trauma; that any blow would have to be a severe blow to cause direct trauma to the heart probably some bruises and abrasions, probably a crushing injury to the chest cage or fracture of the ribs.
Employer's Dr. Stanley M. Wald, who treated claimant at the veterans' hospital, took claimant's history in longhand. That history shows that claimant suffered a severe heart attack on January 1, 1950 while doing heavy work at a coal mill; that since then claimant has suffered no shortness of breath but has experienced occasional precardial jumping, and had three episodes of dizziness in the summer of 1949 with sweating and vertigo but no nausea; that during the previous two or three years he has had cutting substernal pain, not brought on by exertion, which would come on after lying down and last only one minute; that he has had exertional dyspnea associated with wheezing sounds in chest for past ten years, but no orthopnea and no history of chronic cough. Dr. Wald further testified that his diagnosis was acute myocardial infarction due to arteriosclerotic coronary thrombosis, and that claimant had symptoms suggestive of heart disease prior to January, 1950. W. J. Tapley told of an accident in the fall of 1945 when he took claimant from the plant in an automobile to Dr. Chilton's office. Claimant was in apparent pain and was suffering. Claimant told him he was suffering from a stomach ailment. He had shortness of breath, was breathing abnormally and was laboring from his sickness.
Appellant contends that claimant's own testimony demonstrates that no accident occurred; that on the very night of the heart attack claimant did not tell any of his co-workers or the doctor about any accident or unusual occurrence, but merely related that while pulling on the brake wheel the pain hit him in the chest; that the examining doctor found no scratch, cut or bruise on claimant's body; that he told the doctor at the Veterans Administration Hospital that he had all the symptoms of heart trouble, which he had experienced for years; that for seven months claimant made no report or claim that the hand brake slipped and jerked, throwing him with force against the car; that claimant's every act and statement for seven months was consistent with a noncompensable heart attack overtaking claimant while attending to his regular duties, unaccompanied by any mishap or violent occurrence; that seven months after the occurrence claimant changed his story by adding the slipping and jerking of the hand brake, and calls attention to these discrepancies: that at the taking of his deposition claimant testified that he received no bruises, cuts or broken skin and that he did stop the railroad car, whereas at the hearing before the referee claimant testified that he was bruised and that he did not stop the car, but that a chock or block stopped it. Appellant further points out that claimant swore at the hearing that he was working with Dick Crain when injured, whereas Crain testified that he was working elsewhere that night; that claimant testified that Wheeler or Porter let the car down the track whereas they did not even know how to do so, this having been their first night on the job; that Wheeler testified that claimant took a sledge hammer and showed him how to open the doors underneath the car, which is wholly inconsistent with claimant's claim that immediately prior thereto he had suffered a severe heart attack; that while claimant testified that he told Crain, Sutton and Doctors Lanning and Wald about his accident, all four of these witnesses swore that he did not do so.
As a reviewing court, our duty is to sustain the findings of the referee, commission and circuit court unless, upon the whole record, their findings are not reasonably supported by competent and substantial evidence. Mershon v. Missouri Public Service Corp., 359 Mo. 257, 221 S. W.2d 165, loc. cit. 169. An award can be set aside by judicial decision only where it *519 is clearly contrary to the overwhelming weight of the evidence. Wood v. Wagner Elec. Corp., 355 Mo. 670, 197 S.W.2d 647, loc. cit. 649.
The evidence given by claimant at the hearing, if accepted as true, authorized the commission to find that claimant sustained an accidental injury. Notwithstanding claimant was the only witness to the alleged accident, his testimony, if believed, constituted substantial evidence of the fact that an accident occurred. Keller v. St. Louis Butchers' Supply Co., Mo.Sup., 229 S.W. 173, loc. cit. 175; Tuller v. Railway Exp. Agency, Mo.App., 235 S.W.2d 404, loc. cit. 406; Reed v. Railway Exp. Agency, Mo.App., 235 S.W.2d 401, loc. cit. 404; Walker v. Pickwick Hotel, Mo.App., 211 S.W.2d 55, loc. cit. 58. The inconsistencies between claimant's testimony given at the hearing and in his deposition and the differences between his testimony and that of appellant's witnesses presented a mere conflict of evidence involving the question of the credibility of the witnesses. Reed v. Railway Exp. Agency, supra; Tuller v. Railway Exp. Agency, supra. It was for the commission to determine, under all the circumstances, what effect it would give to the evidence. Clevenger v. Standard Steel Works, Mo.App., 230 S.W.2d 113. The reviewing court should adhere to the rule of deference to findings involving the credibility of witnesses made by those before whom the witnesses gave oral testimony. Wood v. Wagner Elec. Corp., supra, 197 S.W.2d loc. cit. 649. While this does not mean that the court must close its eyes and blindly follow the finding of a referee, it does not mean that this court may substitute its own judgment for that of the commission. Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55, loc. cit. 62. Viewing the whole case impartially we cannot say that the award of the commission in this case is clearly contrary to the overwhelming weight of the evidence.
Nor can we sustain appellant's contention that the alleged accident could not have happened as claimed. Appellant's expert testimony that it was mechanically impossible for the brake to slip when applied was not conclusively binding, either upon the claimant or upon the commission. It was for the triers of the fact to accept or reject this evidence, depending upon whether or not they regarded it as credible, persuasive and satisfactory. From the evidence adduced we cannot say, as a matter of law, that the slipping and jerking described by claimant was a manifest physical impossibility. Whether it was or not was a question for the commission to resolve. Appellant cites cases in support of the rule that the commission may not arbitrarily disregard and ignore competent, substantial and undisputed evidence of witnesses who are not shown by the record to have been impeached, and may not base its finding upon conjecture or mere personal opinion unsupported by sufficient competent evidence. While the commission cannot disregard competent, substantial testimony, it is not compelled to accept it as true. McCoy v. Simpson, 346 Mo. 72, 139 S.W.2d 950. The commission passes upon the credibility of the witnesses and may reject a defense solely upon the lack of credibility of uncontradicted and unimpeached expert testimony offered in support of the defense, just as it may reject a claim solely upon the lack of credibility of uncontradicted and unimpeached testimony offered in support of the claim. Smith v. Smith, 361 Mo. 894, 237 S.W.2d 84, loc. cit. 89; Long v. Mississippi Lime Co. of Mo., Mo. App., 257 S.W.2d 167; Veal v. Leimkuehler, Mo.App., 249 S.W.2d 491, loc. cit. 496. In this case the expert who testified was the sales manager of the brake manufacturing company and the designer of the brake. It may well be that the referee and commission rejected or discounted his testimony on the ground of his interest in the matter.
The same rule applies to appellant's argument that, considering claimant's position on the platform, the situation of the wheel, and the manner in which he was standing and applying the force to the wheel, claimant's body would have been thrown backwards, away from and off the *520 car instead of into and against the end of the car, had the wheel slipped and jerked in the manner described by claimant. Appellant cites Weltmer v. Bishop, 171 Mo. 110, 71 S.W. 167, 65 L.R.A. 584; Hook v. Missouri Pac. Ry. Co., 162 Mo. 569, 63 S. W. 360; Krause v. Pitcairn, 350 Mo. 339, 167 S.W.2d 74. In the Weltmer case, supra, there was testimony that by a mental process transmitted by a letter which was sent several hundred miles plaintiff was entirely cured of cancer of the breast. The court, branding this testimony absurd, announced that courts are not required to give credence to a statement which falsifies well known laws of nature. In the Hook case, supra, plaintiff testified that as he approached the crossing he looked in the direction in which the train was coming and did not see a train, although the physical situation was such that it could not be true that he looked and failed to see a train. The court laid down the rule that when to look is to see, the mere utterance that one did look and could not see would be disregarded as testimony without value for the consideration of the jury. The Krause case, supra, was a railroad crossing case brought under the humanitarian doctrine and the court reiterated the rule that utterances of witnesses in contravention of the laws of nature or physics are not treated as testimony of probative value merely because uttered. These cases are not apposite and do not touch the situation in the case at bar.
Considering the precarious position of claimant, perched in a crouched position on a narrow ledge seven feet above the ground, and the natural inclination of a 250 pound man, under those circumstances to cling to the railroad car and avoid a fall to the ground, it cannot be said as a matter of law that claimant's testimony is opposed to the laws of physics, absurd, impossible and without value. Claimant's left foot was about two feet ahead of his right foot. The evidence was that claimant did not lose his footing until the brake slipped. He grabbed onto the car after he fell into the end of the car. His left side was toward the car before the casualty and it was his left arm and side that struck the car. The commission reasonably could have inferred that upon the occurrence of the jerk or slip claimant changed his footing and equilibrium in such a manner that, in his effort to prevent a fall to the ground, he was caused to fall into and against the end of the car.
The award of the Industrial Commission therefore should be affirmed as entered unless it should be doubled under Section 287.510, RSMo 1949, V.A.M.S., as claimant contends on his appeal. Section 287.510 provides that if a temporary or partial award "be not complied with, the amount thereof may be doubled in the final award, if the final award shall be in accordance with the temporary or partial award." This language is permissive and not mandatory. It vests a discretion in the Industrial Commission. The appellate courts should not interfere with the exercise of that discretion unless it clearly appears that the action of the commission was arbitrary and constituted an abuse of discretion. Cebak v. John Nooter Boiler Works Co., Mo.App., 258 S.W.2d 262, loc. cit. 266. There is nothing in the instant case to indicate that the Industrial Commission acted arbitrarily or was guilty of abuse of discretion in failing to double the award.
The Commissioner therefore recommends that the judgment of the circuit court in all respects be affirmed.
PER CURIAM.
The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.
The judgment of the circuit court is, accordingly, affirmed.
BENNICK, P. J., ANDERSON, J., and HOLMAN, Special Judge, concur.