ROY TIMOTHY THOMPSON, (Employee) Appellant, v. RAILWAY EXPRESS AGENCY, (Employer) Respondent.—236 S. W. 2d 36.

St. Louis Court of Appeals. Opinion filed January 16, 1951.

Respondent's motion for rehearing, or, in the alternative, to transfer the case to the Supreme Court of Missouri, overruled February 16, 1951.

*George F. Addison* and *Luke, Cunliff & Wilson,* for Appellant.

*Watts & Gentry* and *Herbert E. Bryant,* for Respondent.

WOLFE, C.—This is an appeal by an employee from a judgment of the circuit court affirming a final award of the Industrial Commission. The award so affirmed ordered the payment of compensation from January 21, 1945, to June 18, 1947, in the sum of $2500. It is the contention of the employee that he suffers a continuing disability for which the award does not adequately compensate him.

It was admitted that the Railway Express Agency was a major employer operating under the provisions of the Missouri Workmen's Compensation Act; that the employee was working under the provisions of the act and earning an average wage in excess of thirty dollars a week.

Thompson, the employee, was a man fifty-three years of age, who had lived in Shannon County before moving to St. Louis and while living there had engaged in working at sawmills, carpentry and similar occupations. He started his employment with the Railway Express Agency in August of 1943 and worked for it continuously until the time of the accident. He had never been in ill health before and had had been a good worker during the time that he was in the employ of the respondent. He was a freight handler in the yards adjoining Union Station and on January 21, 1945, he was working on a platform which is located between the tracks upon which express cars stand for loading and unloading. At the time he claims to have sustained a series of accidents, he was engaged in unloading expressed merchandise from a car onto small trucks or wagons. These trucks are designed to be pushed by hand or coupled together and pulled by a tractor.

The evidence relating to the happening of the accidents comes only from Thompson himself. He testified that late in the night of the day he was injured he was engaged in unloading an express car and on it was a large box weighing about 480 pounds. It was too heavy to lift and he tried to "scoot" it over by pushing it. While so engaged his "feet kind of slipped back" and he "tore" himself or hurt himself in the lower part of his stomach. About that time his foreman came along and wanted him to get an empty hand truck so he started from the express car to get it.

As he was going down the platform for the "empty" a string of empty trucks being pulled by a tractor came toward him and as the tractor turned the trucks swung in his direction shoving him against a railroad car. These trucks were about waist high and he tried to keep pushing them away but they "rolled" him along the side of the railway car. He shouted and the foreman, who was close by, told the tractor driver to stop. Thompson in relating his subsequent conversation with the foreman said: "He asked me how bad I was hurt. I asked him if he hadn't walked over dry sticks and things and I said that is how my bones is popping. I don't know how to answer." The foreman then told Thompson that they would go to the station and report the matter and both of them walked up to a guard constructed at the end of the tracks near the gates leading to the station. At this point the foreman sat down and according to Thompson, "He just sit there and shook and I begin to get kind of nervous and I asked, 'What are you going to do?' He said, 'Go down to the box car and wait and I will see about you. If you are not any better we will see about it.'"

Thompson then went back down the platform and started to climb into an empty express truck. He had swung one leg up and was in the act of pulling himself on to the truck when his foot slipped on some ice and he fell astride the corner of the truck striking his testicles. He could work no more that night and McNiell, his foreman, was informed that he was hurt, after which he sat in the station midway until closing time when McNiell took him home. On his arrival at home he went directly to bed and started running a temperature. He could not urinate and was in considerable distress, so the following day he consulted a doctor. Thompson said that the first doctor he called upon could do nothing for him, but told him "If you are not dead in a few days you can come back and I will see what I can do about it."

On January 26, Thompson went to the hospital where he was treated for hydronephrosis and pyelitis, kidney ailments which develop over a period of time but may be aggravated by trauma. He stayed in the hospital for ten days and then returned for further periodical treatment in the clinic up to March 16, 1945, and again visited the clinic for further treatment in February of 1947.

He testified that since the time of the accidents he has been unable to engage in any employment for wages and that his work has been limited to small chores about the farm, such as milking one cow when there is no one else to do it, and cutting some hay with the mower. He said that he gets the ''shakes'' until he nearly ''shakes to pieces'' from pain radiating upward from his testicles through his stomach.

On January 18, 1947, he was examined by a Dr. Demler, who testified for the employer and stated that he found no physical disability at the time of the examination and expressed as his opinion that Thompson could return to normal work, from a physical standpoint, but said that he made no psychiatric examination of the patient and that he could express no opinion on his neurological condition.

Over a year later Thompson was examined by a Dr. Walter L. Moore, who said that the patient complained of pain in the lower abdomen which, at times, extended from the top of his head to the bottom of his feet. The doctor testified that the symptoms and complaints were bizarre and in no way similar to the history given by patients suffering from any known organic disease. He said that the pattern of Thompson's complaints were typical of the symptoms seen in the functional mental disease known as psychoneurosis and that the pains were real to the patient. The conclusion that Dr. Moore reached was that this psychoneurosis of the hypochondriasis type was caused by the series of accidents that the employee suffered. He also stated that the patient was a psychopathic invalid unable to work at the time he examined him and in need of psychotherapy.

Upon this evidence the referee found that the employee sustained an accidental injury arising out of his employment resulting in a disability, the nature and extent of which could not be determnied at the time of the hearing, and that the employee was in need of additional medical treatment. The Industrial Commission reviewed the case, upon the application of the employer, and it found that the employee suffered an accidental injury to the ''testicles, urinary tract, nervous system.'', but it also found that the disability terminated on June 18, 1947, at the time Dr. Demler examined him.

On this appeal the employee contends that the finding by the Commission that his disability terminated on June 18, 1947, is not supported by substantial and competent evidence but is, on the contrary, against the overwhelming weight of the evidence.

We cannot substitute our judgment for that of the Commission but we are obliged to determine whether the Commission, from a consideration of all the competent evidence before it, could have reached the finding it made. If the finding is clearly contrary to the overwhelming weight of the evidence, we should set it aside. Wood v. Wagner Elec. Co., 355 Mo. 670, 197 S.W.2d 647; Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S. W. 2d 55; Sanderson v. Producers Commission Ass'n., Mo.Sup., 229 S.W.2d 563;

Moore v. R. C. Can Co., Mo.App., 229 S. W. 2d 272; Johnson v. Great Lakes Pipe Line Co., 358 Mo. 445, 215 S.W.2d 460; Williams v. Laclede-Christy Clay Products Co., Mo.App., 227 S.W.2d 507.

Considering the finding made, it is evident that the Commission found that the employee suffered from a psychoneurosis resulting from accidental injury, for the finding as to the injuries includes injury to "nervous system" and the only evidence relating to the nervous system is the testimony of Dr. Moore touching upon the psychoneurosis from which the patient suffered. In holding that such an injury is compensable, the Commission followed what appears to be the generally accepted law. One of the leading cases on the subject is In re Hunnewell, 220 Mass. 351, 107 N.E. 934, where the court held that a functional neurosis caused by an accidental injury to the eye came within their act. This has been followed where a causal relation has been established between the accident and a functional neurosis. However, some of the cases seeking to follow the Hunnewell case have had little regard for the necessary causal relation, of the neurosis complained of, with an accidental injury. See: Smith v. Essex County Park Commission, N.J., 190 A. 45; Safeway Stores, Inc. v. Gilbert, 68 Ariz. 202, 203 P.2d 870; Hood v. Texas Indemnity Co., 146 Tex. 522, 209 S.W.2d 345. A psychoneurosis under some circumstances does present compensable injury but this should not open the way for indiscriminate compensation on that score simply because it follows an accident. The causal connection with the accident must be proven by clear evidence, for such a neurosis may arise from any number of causes. Dr. Moore testified that Thompson's condition might have been aggravated by the discouraging and rather frightening statement made to him by the first physician he called upon. It might have been aggravated by his hospital treatment. That such conditions can and do at times arise from such things as unhappy domestic situations, social relations, or financial worry, leaves their cause for the most part in the realm of nebulous speculation. The causal connection with an accident must not be remote. This view was expressed in Kowalski v. N. H. & H. R. Co., Conn., 164 A. 652, l.c. 655:

"We must also decline to recognize that the compensable consequences of an injury, although far reaching so long as the chain of causation remains unbroken, may be extended so as to include unhappy mental or nervous states which do not pertain to the original injury, except in the sense that they arise from the pendency of proceedings for compensation for the injury or anxiety because compensation may be terminated. The distinction between such a situation and a functional nervous upset and neurotic condition having causal relation with the personal injury is obvious."

Here, however, we have an employee who enjoyed good health and worked without interruption before the series of adcidents of which

he complains. He is a man of a limited education, apparently well-meaning and co-operative and there is no suggestion of malingering. He developed the psychoneurosis immediately after the accidents and in the opinion of Dr. Moore, a specialist in nervous and mental diseases, the accidents brought this condition upon him. Such evidence fully supports the Commission in its finding that the psychoneurosis was the result of the accident.

Having properly reached that conclusion the Commission then found that the disability terminated at the time Dr. Demler examined Thompson. They apparently arrived at their finding from the following portion of Dr. Demler's testimony:

"Q. In your opinion, doctor, based upon your examination of this man, is this man in such physical condition as could return to normal work? A. Oh, yes sir."

This question and answer was preceded by the doctor stating that the patient had complained of pain radiating up from his testicles, and following this question and answer the interrogation of Dr. Demler continued:

"Q. Would you approve him for employment with the Railway Express Agency based on your examination in 1947? A. From a physical examination, yes, sir. I would have to get his complaint cleared up."

He made no psychiatric examination and expressed no opinion as to the existence or duration of any psychoneurosis that might be present. The only evidence, therefore, as to the duration of the condition came from Dr. Moore, who said that it was continuing, and from the employee, who described the pains from which he claims to be still suffering.

We must conclude therefore that the finding of the Commission that the disability (which it properly found to exist) had terminated, was not supported by any evidence.

For the reasons stated above, it is the recommendation of the Commissioner that the judgment of the circuit court be reversed and the cause remanded to that court to be remanded to the Industrial Commission of Missouri, Workmen's Compensation Division, for further proceedings not inconsistent with the views herein expressed.

PER CURIAM:—The foregoing opinion of WOLFE, C., is adopted as the opinion of the court.

The judgment of the circuit court is accordingly reversed and the cause remanded to that court with directions to remand it to the Industrial Commission of Missouri, Workmen's Compensation Division, for further proceedings. *Anderson, P. J.,* and *McCullen* and *Bennick, JJ.,* concur.