Mary Rose PATANE (Plaintiff), Appellant,

v.

STIX, BAER AND FULLER (Employer), Respondent,

and

American Insurance Company (Insurer), Respondent.

No. 30184.

St. Louis Court of Appeals.

Missouri.

July 21, 1959.

Motion for Rehearing or to Modify Opinion or to Transfer to Supreme Court Denied Aug. 24, 1959.

Charles A. Mogab and Donald S. Hilleary, St. Louis, for appellant.

Edw. C. Friedewald, St. Louis, for respondents.

RUDDY, Judge.

This is an appeal by an employee in a proceeding under the Workmen's Compensation Law, section 287.010 et seq. RSMo 1949, V.A.M.S.

A Referee of the Division of Workmen's Compensation of the Department of Labor and Industrial Relations found in favor of the employee and entered an award of temporary total disability in the amount of $30 per week from March 1, 1955, to March 5, 1955, and for the additional period from February 18, 1956, to June 28, 1957. The Referee ordered employee's claim reset for further hearing on or about March 1, 1958, to further determine employee's condition.

The employer and insurer applied to the Industrial Commission of Missouri for a review by the full Commission. The full Commission, with one member dissenting, found that the employee sustained an accident on February 28, 1955, arising out of and in the course of her employment and that as a result of said accident the employee was temporarily totally disabled from March 1, 1955, to March 5, 1955, and that she has been fully compensated therefor. The majority of the full Commission further found that the employee "is now suffering from simple, chronic glaucoma;

that said disease preexisted the accident; and further, that said disease was not caused or aggravated by the accident of February 28, 1955." The Commission further found "that the employee is now totally disabled by a condition known as psychoneurosis, mixed type." The Commission further found:

"* * * that this psychoneurotic condition was caused or precipitated by her being released from her employment on February 17, 1956, and that it was not caused or aggravated by the accident of February 28, 1955."

The Commission said:

"In reaching this conclusion, we notice that the psychoneurotic condition did not evidence itself for almost a year after the accident. Cf. Thompson v. Railway Express Agency, [Mo. App.], 236 S.W.2d 36, loc. cit. 39. During this period of time, so far as we can determine from the record, the employee continued with her usual work; she made no complaints to the employer referable to the accident. Her work, though possibly sub-standard, was on a par with her pre-accident efforts. Further, we note that her Claim for Compensation was filed on February 20, 1956, three days after her release from her employment. All of these things considered together, constrain us to find and conclude that the release from the employment, and not the accident, caused or precipitated her psychoneurotic condition."

The Commission denied the employee further compensation and reversed the award of the Referee.

The employee appealed to the Circuit Court and from the judgment of that court affirming the award, the employee appeals to this court.

The employee contends that the Commission erred in not finding that the psychoneurosis was caused or precipitated by the accident of February 28, 1955, and further contends there was no substantial evidence to support the findings of the Commission, (1) that the psychoneurotic condition did not evidence itself for almost a year after the accident and (2) that her work, though substandard, was on a par with her pre-accident level.

Employee further contends that the other two findings, namely, (1) "she made no complaints to the employer referable to the accident" and (2) filed her claim for compensation three days after her release from her employment, do not give rise to a substantial inference that she was not suffering from psychoneurosis by reason of the accident.

Employee further contends that the overwhelming weight of the evidence shows that the psychoneurotic condition was caused or precipitated by her accident February 28, 1955.

The above contentions require a full statement of the facts as they pertain to the issues presented. The employee, Mary Patane, had been employed by Stix, Baer and Fuller, a department store, as a saleslady in the housewares department, from August 12, 1946, to February 17, 1956. At the time she testified before the Referee she was 45 years of age. She had an eighth grade education and had never been married. She lived with her mother, father, brother and sister-in-law. She is the oldest of five children and helped her mother raise the other children. She had never "gone out with fellows at any time" and never had any romances. She was very religious and wanted to follow a religious vocation, but this was denied her because of the need for helping the mother raise the other children. The testimony shows she spent all of her life close to the family circle and on her trips to the movies or when automobile riding she was always with the family.

Prior to February 28, 1955, she worked regularly in her employment at Stix, Baer

and Fuller, never had any pain in the head; had no trouble with her eyes, other than the need to wear glasses when she was working. When asked if she had any dizzy spells before the accident, she answered: "I used to get hot flashes at times, due to age, but other than that, that's all." She was able to sleep well and physically speaking her health was good. However, the evidence shows she had a psychoneurotic personality long before the accident.

There is no dispute as to the cause of the accident inflicting the injury of which the employee complains. On Monday, February 28, 1955, about 2:30 P.M., the employee was struck on the head by a lid of a counter. The record indicates that the lid of the counter when lowered formed a part of the counter. It was hinged on one side and could be raised, we assume, for purposes of ingress and egress. On the occasion of the accident the counter lid was in a raised position and while the employee was putting merchandise underneath the counter and below the counter lid, the lid fell and struck the employee on the top of her head. The employee testified that the blow "knocked me out and knocked my glasses off and it knocked me delirious * * *." In another part of her testimony she said she fell to the floor and started screaming but was able to get up without help. She said she felt pain in her head immediately after the blow and felt real dizzy. She said she "had a bump and a bruise on the top of" her head that was "about as big as a good sized egg." However, her head was not cut or bleeding.

The employee further testified that she was taken to the first aid room where the nurse put ice on her head and gave her some medicine. From the first aid room she was sent to Dr. Richard Sutter. She said Dr. Sutter looked at her head and then at her eyes and asked her if she was cross-eyed. The doctor made some reflex tests, gave her some pills to take for pain and instructed her to return the next day. She saw Dr. Sutter the next day and again on the following Thursday. Dr. Sutter did not take X-rays on the first visit, but on the employee's request he took X-rays on a subsequent visit and they showed negative. She further testified that Dr. Sutter told her to return to work, but, because of the constant pain in her head and eyes, she felt she could not work and did not return to her employment until the following week. Dr. Sutter gave her no medication. She complained to him about her eyes and he sent her to Dr. Milster. She again saw Dr. Sutter about six months after the accident. The lump on her head remained approximately two weeks. She lost one week from work and lost no time after she returned to her duties. After she returned to her employment she said the dizzy spells and the pain in her head and eyes continued. However, she said the pain in her eyes subsided when she kept them under medication.

Pursuant to the instructions of Dr. Sutter she saw Dr. Milster who examined her eyes and he told her she had glaucoma. She said she could not believe there was anything wrong with her eyes and saw Dr. Keller, another opthalmologist, who verified the diagnosis of Dr. Milster. Drops were prescribed for her eyes to reduce the pressure. She continued with Dr. Keller about six months and then returned to Dr. Milster, who is still treating her eyes.

On February 17, 1956, she was released by Stix, Baer and Fuller and in this connection she testified she was released "because I wasn't able to do my work right and I couldn't meet the selling cost * * I wasn't feeling good * * *."

She further testified that she was sent by her lawyer to see Dr. Walter Moore, whose specialty is neurology and psychiatry. Her first visit to him was on March 8, 1956, and she again saw him a week before the hearing held before the Referee. On the first visit he sent her to Barnes

Hospital for a "brain wave test." Dr. Moore gave her some pills, which she took for about one week and then discontinued them because they were not making her feel any better.

She further testified she was examined by Dr. Ernest H. Parsons, a neurologist, on September 18, 1956, who also had her take a "brain wave test."

Since February 18, 1956, the date of her discharge, she has not been employed. When asked to describe her condition since the last named date, she said: "I always have pain in my head more or less every day * * * I get dizzy spells and a lot of times when I am walking around I bump into doors and walls without knowing how I did it." She said the dizzy spells and the sharp pains in her head arouse her during the night. When asked about her eyes, she said: "As far as Doctor Milster's last report he said I am holding my own, * * *."

The employee's description of her feelings and condition at the time of the hearing was essentially the same as that given of her condition since February 18, 1956. She added to this description her present disinterest in picture shows and baking, both of which she said she enjoyed prior to the accident. She said she was nervous and was taking aspirin and vitamins prescribed by her family physician, Dr. Javaux. At the conclusion of her direct testimony she said the pain never leaves her head and that she could then feel an area of tenderness on the top of her head.

On cross-examination she admitted she was told when she started her employment there was something wrong with her eyes. She admitted periodic surveys were conducted by the employer, usually every six months, which had for their purpose the evaluation of the employee's work. These evaluation reports were shown the employee and she admitted the reports showed she was not meeting her quota of sales assigned to her. Her quota was $780 per week. Mr. Bevirt, her imme-diate supervisor, would discuss with her the contents of the reports.

She further testified on cross-examination that her supervisor and others were not satisfied with her selling ability. She suggested to them that she be placed in a non-selling job. In July 1954, in a discussion with Mr. Bevirt and Miss Hibbets, they told her that unless she improved they were going to discharge her. She said they gave her 90 days to improve her sales ability. Again in January 1955 they told her the same thing. On one of these occasions she cried and "almost went into hysterics." She was then told they would give her more time. In May and September of 1955 she was again interviewed by her superiors and told she would have to increase her sales or be discharged. When she was asked if she told her employers that the pains in her head and her eyes were interfering with her work, she answered, "Yes I did." She said she talked to Miss Niehaus and told her that she gets pains in her head and is awful dizzy and Miss Niehaus told her not to tell her, but to tell the American Insurance Company. She did not tell Mr. Bevirt or Miss Hibbets about her pain. She further testified on cross-examination that she complained to Dr. Sutter about her eyes and complained to Dr. Milster about the pains in her head, because she thought they were caused by her eyes. She was asked "How often did you tell Dr. Milster you had pains in your head after the accident?" and she answered "Every time I went over there." She said that she also told him she had pains in her eyes. Before she was hurt in February of 1955 her weight was 121 lbs. and at the time of her testimony it was 108 lbs. In the course of her cross-examination, when she was asked if her sales record was the same following her injury as it was before the injury, she answered: "That last year that I worked there, you have my income tax paper, that was the biggest year I ever had, and naturally, I was selling, I wouldn't get that much if

I didn't." She said her services were terminated on February 17, 1956, and she was paid through March 1956. On February 20, 1956, which was three days after the termination of her services, she filed her claim for compensation. She said she had made applications for other jobs since her discharge, but has not been able to get work. Near the conclusion of her cross-examination she said that her condition has gotten "worse" since the injury.

Gracie Patane, mother of the employee, testified that before the accident her daughter never complained about her head; would help with the baking and other housework; and joined in the social activities of the family. She further testified that since the accident her daughter has been irritable and nervous; never wants to go out; has reduced her household activities; complains of her head and does not sleep as well as before the accident.

The testimony of Marion Patane, brother of the employee, was essentially the same as that of the mother. In addition, he testified to other facts. He said that before the accident his sister made no complaints about her work and seemed to enjoy it. He further said that she definitely is not the same person at the present time and is always complaining about pressure and pain on the top of her head. He did not know about the trouble with her eyes which was noted when she started her employment, and to him her eyes looked perfectly normal. He saw no tendency to being cross-eyed. He further testified that on the day she was injured, "she seemed to be swollen around the face above the eyes and her head seemed to be swollen * * *." She did complain of pain at that time and it seemed to the witness that the swelling continued "for quite a few weeks" after the accident.

The deposition of Dr. Richard A. Sutter was offered in evidence by the employee. Dr. Sutter testified that he was a physician and surgeon, specializing in the diagnosis and treatment of injuries and the evaluation of injuries due to accident. The first examination by him of the employee was made February 28, 1955, the day of the accident. His examination disclosed that the employee's head and scalp revealed a very small abrased area on the middle of the top of the head. She complained of tenderness on the top of her head and said her head hurt. Dr. Sutter when asked: "Would that abrasion in and of itself, of that size, be sufficient to account for the lady's complaints that she gave you, Doctor?" answered "No." On this first examination he found no swelling in the area of her injury and no evidence of fracture; her pulse and blood pressure were normal; she stood in Romberg's position normally; and her knee reflexes were normal. In his examination he did notice she had what he thought was an old deformity in her eyes. He explained that her eyes just did not look normal, adding, however, that he did not make a point of examining her eyes at that time. He said she made no complaints to him referable to her eyes; that her sole complaint was referable to her head and was out of proportion to the small abrased area that he found on her head. He further testified that from the examination he made he could not say whether she had glaucoma because, as he stated, that was one of the farthest things from his mind. He summed up his first examination of the employee in the following answer:

"Following my examination I was quite sure that she had not injured herself very badly. I mean there was no induration or thickening of tissues on the top of her head * * * But as I remember her findings were practically non-existent. In fact, it is almost a rule in my office that anyone who has ever been to the office and has any foundation at all with reference to the head has an X-ray series. And X-rays weren't taken. I do that to protect the patient."

Dr. Sutter saw the employee again on March 2, 1955. On that occasion she complained of discomfort in the region of the forehead and insisted that both of her eyes had been badly swollen the night before. His examination disclosed no evidence of swelling or of injury to the tissues about the eyes. There was no redness, discoloration of the eyes or the tissues surrounding the eyes. He had her stand in Romberg's position and she showed no evidence at all of swaying either to the right or left. He prescribed no medication. On the employee's insistence he had X-rays taken. In this connection he said he took the X-rays, not in pursuit of any intracranial injury, but he thought it would make her feel better. The X-rays showed negative.

He saw her again on March 7, 9 and 11. Her complaints on these visits were the same as they were on her previous visits. His examinations on these occasions disclosed nothing other than what he found on the previous visits. On March 7th he learned she had not returned to work and he told her she should do so. He stated again that on these visits he found no sign of intracranial pressure and that he found her blood pressure and pulse normal, which indicated to him that "apparently no change in her physical status had taken place." He concluded "that her complaints were not the result of this experience of February 28, 1955." On March 11 he discharged her but sent her to Dr. Mason, an eye specialist, for examination.

The last time Dr. Sutter examined the employee was September 21, 1955. The record does not disclose who arranged for this examination. On this date the employee complained of pressure in the head and that this occurred off and on all day. She said it pained the most "in the middle of the right side of the head." The physical examination showed no external sign of injury to the head and scalp; there was no redness, swelling, discoloration or abnormal prominences; there was no point of tenderness; and no evidence of fracture or of intracranial pressure. He found the pupils of the employee's eyes were pinpoint. In this connection he said, "This is the result of an old disease process and not the result" of this experience. He found the employee's blood pressure normal and her reaction to various tests showed normal. Dr. Sutter was asked his opinion of the employee following this examination and he answered: "It was my opinion that there was at this examination no finding to account for the patient's subjective claims, and it was my opinion that she had completely and totally recovered from the experience of 2–28–55."

In his testimony Dr. Sutter again said her "subjective complaints of this deep-seated pain inside her head" were not caused by the accident that occurred February 28, 1955. Dr. Sutter stated he did not treat people with neurological and psychiatric problems, but did make a neurological examination of the employee on this last visit. In connection with this examination the following questions were propounded and answers given:

"Q. Well, suppose you have a patient that gets hit on the head and they have complaints of ill being that are all out of proportion to the objective findings in the case; isn't psychoneurosis or post-traumatic neurosis something that definitely should be considered in determining whether or not they are suffering from a psychoneurosis or post-traumatic neurosis? A. Yes.

"Q. In this case this lady had that type of complaint from the very beginning, did she not? A. As I recall, it was my impression that her complaints were not well founded. I did not think of her in terms of having a psychoneurosis.

"Q. Then, I believe we can get right down to brass tacks, Doctor: You didn't believe the woman's com-

plaints, is that correct? A. I didn't believe her complaints referable to her head.

"Q. All right. And in your handling of her case you handled it on the basis of disbelieving the woman's complaints in regard to her head? A. No, I wouldn't have referred her to Dr. Mason if I thought that. I sent her to a specialist for evaluation of her complaints. I did not feel her complaints were the result of this accident, but I felt that in my opinion and based on physical findings and having seen her and examined her it was a trivial accident."

Repeatedly throughout the cross-examination Dr. Sutter said he did not believe the employee's complaints were the result of the accident.

The deposition of Dr. Clyde R. Milster was offered in evidence by the employee. Dr. Milster is associated with Dr. Mason. He limited his practice to opthalmology. He examined employee the first time on March 15, 1955, and many times thereafter. He examined her eyes externally and internally. She made no special complaints to him referable to the eyes and at no time complained of pain in the head or in any other part of her body. She told him she wanted to know whether there was anything wrong with her eyes. After examination he found her suffering from a chronic simple glaucoma. He also found that she had approximately 25 degrees of left exocataphoria, which means her eye turned out 25 degrees from a straight out position, which Dr. Milster said was caused by muscle impairment. It was his opinion that the glaucoma he found was not causing her any pain and that the employee had been suffering from the glaucoma for "at least six or eight months." He said this opinion was based on the cupping of the nerve when seen with the opthalmoscope and some atrophy he found in the nerve heads of the eyes. He further testified that if employee had

deep-seated pain in her head it was not from the glaucoma. He was asked if glaucoma can be a psychomotor manifestation of a psychoneurosis and he answered, "In my opinion, no." He said he has never seen glaucoma as a psychomotor manifestation of a psychoneurosis. After medication following the first visit, the pressure in the eyes had fallen significantly. During the course of his first examination he tested her vision and prescribed new glasses. His last examination of the employee took place November 5, 1956. He found no change in the field of vision and it was his diagnosis that she was still suffering from simple glaucoma and that it has not caused any pain. He further found that it was not disabling as long as she remained under medication and as far as he knew she could carry on her functions as a sales girl.

Dr. Walter L. Moore, offered as a witness for the employee, testified that he is a physician, specializing in neurology and psychiatry. He examined the employee on March 8, 1956, at which time she complained of pain in the back and top of the head. However, he said her chief complaint was pain over the right side of the head. She said this pain existed since the accident. She told him that in the past several months the pain has been getting worse. In his physical examination of the employee he found her blood pressure, pulse and respiration normal. On examination of the head he could find no abnormal elevations or depressions and no abnormalities of the skull. He found she had pinpoint pupils, which he said was from the treatment for glaucoma. He also found she had a simple strabismus (cross-eyed condition).

He made a neurological examination and found no weaknesses or any instability suggesting injuries to the central nervous system. He had an electroencephalograph taken and found the results within normal limits. He said neurologically he found nothing wrong with the employee. He

made a psychiatric examination of the employee and found that she is "emotionally extremely unstable." She was very apprehensive and tense. There was no sign of mental impairment. He further found that it was difficult to get her to talk about anything other than her head and that she uses her symptoms to explain why she cannot do anything. He felt her glaucoma was a psychomotor manifestation of her psychoneurotic personality and in his opinion the glaucoma is a reflection of a personality that is under tension and pressure.

He further testified that according to the history given him by the patient (employee) the trauma she had experienced precipitated the neurotic mechanism. In giving his psychiatric diagnosis, he said "She is a psychoneurotic, mixed type, what we call anxiety and conversion symptoms predominating."

At the time of the first examination Dr. Moore gave the employee some medicine to take. Within a few days she called him in a very hysterical manner and asked if the medicine was for epilepsy. He tried to reassure her the medicine was not harmful, but she continued to call about the medicine every day for a period of several weeks and he finally told her to stop taking it.

After a period of several weeks he saw the employee again. The only testimony given by him concerning this visit was that he gave her other medicine. He had the same experience with her about this new medicine and he told her to discontinue taking it. He examined her again on June 19, 1957. At that time she had more complaints than she had at the time of the first examination. His findings and conclusions in connection with the physical and neurological examination were the same as on the first examination. The psychiatric examination showed she was still agitated and apprehensive. His psychiatric diagnosis was the same as that made on the first examination. He said

the headache and head pains complained of by the employee were not from the glaucoma.

Dr. Moore further testified that the employee had a psychoneurotic personality prior to the injury. He said the symptoms she now complains of are definitely real to her. He said they are real because "it is a need of this individual to have something to justify her being unable to do what she is supposed to do and that symptom is more than real. * * * she will attribute all of her inadequacies and her complaints now to her trauma."

Based on the history and complaints given to him by the employee and his own findings after examinations, Dr. Moore said it was his opinion that the trauma suffered on February 28, 1955, was a precipitating factor causing this employee's present condition of ill-being. However, on cross-examination when asked to assume that the employee returned to work one week after the accident; that her work record for a full year was identical with her record before the accident; that during that year she never complained to her superiors of headaches or mental or physical impairments, although they talked to her in that time about her deficiency, what his opinion would be as to the effect of the discharge, he answered: "The discharge or firing her could have acted as a precipitating factor in her latent hostility." Another place in his testimony he said: "If she didn't have any complaints until the time of her discharge that would have acted as a precipitating factor." He admitted that if she was deficient in her work and if she thought the bump on the head was the reason for it, she would have used that as an excuse to her employer. He also admitted if she had real complaints of headaches she would have complained about them to the eye doctor. The doctor said she did not impress him as being a malingerer or liar, but he did not have any way to tell, adding that he had been fooled by some people in the past. In his prognosis he said the litiga-

tion should be disposed of, stating: "It gives her a conscious or unconscious motivation for need of symptoms."

Dr. Ernest H. Parsons also testified on behalf of the employee. He stated he was a physician and surgeon and limited his practice to neuro-psychiatry. The only time he saw the employee was on September 18, 1956. Her complaints were essentially the same as those given Dr. Moore. In addition, she told Dr. Parsons that the eye doctor told her, that unless she took care of her eyes she would be walking around with a white cane. She said this statement "petrified" her. He could find no physical or neurological findings of clinical significance. He had an electroencephalograph made which disclosed a normal pattern. The X-rays taken were negative. His psychiatric examination revealed "the patient was a very shy, timid, and nervous person, * * * was not particularly cooperative * * * had many preoccupations about dead people * *." He thought her mental status was that "of a very tense, suggestive, apprehensive, neurotic spinster." His diagnosis was that of "psychoneurosis, mixed type, anxiety and conversion reaction in a personality structure characterized by marked immaturity and schizoid features." Based on the history and complaints given him by the employee and his psychiatric examination, it was his opinion the occurrence of February 28, 1955, caused the disabling condition he found September 18, 1956. However, he said that no single incident, such as the blow on the head, produced her psychiatric illness. This was just a part of a chain that ended with a "completely non-effective person." In one part of his testimony he said he assumed the employee's work in the year after the accident "was decreasingly effective * * *." When asked if the discharge was not sufficient to cause her psychiatric illness, he answered "Yes, you could produce a psychiatric illness in this person by discharging her." He further said that if it was assumed that there was no difference in the effectiveness of the

employee's work before and after the head injury then the discharge was the precipitating factor in bringing about the illness he found. However, he said he found it difficult to make that assumption because of the history related to him by the employee. In other parts of his testimony he said the psychiatric illness could very well manifest itself from the discharge. He thought the fear of being discharged might account for her failure to tell her superiors about her head after she returned to work. In his prognosis he suggested the litigation be settled "so that she does not continue to hold on to symptoms."

On behalf of the employer and insurer, Dr. Richard A. Sutter testified and reiterated the same facts and conclusions he gave in his deposition introduced in evidence by the employee. In addition he testified that "Miss Patane wasn't incapacitated, she was not expressing to me any great amount of pain or concern, there wasn't anything in her demeanor that would indicate to me when she was in the office that she had a headache that was unbearable, she was working."

The testimony of Dr. Clyde R. Milster, a witness called in behalf of the employer and insurer, was the same as the testimony given by him in his deposition introduced in evidence by the employee. He repeated that she made no complaints referable to the eyes and made no complaints of headaches or pains in the head at any time while she was under his care. He saw nothing that would indicate any inability to work.

William J. Bevirt, called as a witness by the employer and insurer, testified that he had been the immediate superior of the employee and it was his duty to evaluate the efficiency of the employees under his supervision. He testified that every six months a personal review is made of each employee to evaluate their services. Each employee was given a quota of sales per week which they were expected to reach. The employee's quota was $780 per week. The witness testified she never did reach

her quota. A number of exhibits were admitted in evidence showing the numerous evaluations made on the employee through the years. No useful purpose would be served in detailing what these exhibits show. While they show some satisfactory qualifications in the employee, they consistently show, especially since 1952, that her sales work must improve. The exhibit of the evaluation made January 5, 1955, shows her sales work unsatisfactory. The witness further testified that the biggest difficulty with the employee was her inability to meet her sales quota, which was the sole reason for her discharge. In the interviews with the employee she was told her sales record was unsatisfactory. On occasions before and after the accident she was placed on "90 days probation" and told if she made no improvement she would be discharged. She was placed on probation at least three times.

The witness did not see the accident, but saw the employee when they were taking her to the medical center. He saw nothing unusual about her composure at that time. After she returned to her duties she never complained about her head or her eyes in the course of the interviews about her deficiencies in her work or at any other time. Her work, so far as conduct and ability were concerned, was no different after she returned than it was before the accident. He said her earnings for 1954 were $2,384.73 and for 1955 were $2,343.66, which included $23.67 for sick pay.

Before considering the points relied on by the employee we review briefly the law governing the extent of our duties in reviewing the award of the Industrial Commission. In Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W.2d 136, loc. cit. 141, the court said:

"Our constitutional provision, Sec. 22, Art. V, 'does not mean that the reviewing court may substitute its own judgment on the evidence for that of the administrative tribunal. But it does authorize it to decide whether such tribunal could have reasonably made its findings, and reached its result, upon consideration of all of the evidence before it; and to set aside decisions clearly contrary to the overwhelming weight of the evidence.' Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S.W.2d 647, 649; Seabaugh's Dependents v. Garver Lumber Co., 355 Mo. 1153, 200 S.W.2d 55."

█ We point out that the award of the Referee in this case is contrary to the award of the Commission. Nevertheless, it is the award of the Commission that is reviewed by this court and not the award of the Referee. However, the Referee's award and findings are a part of the record in this case and will be given due consideration. Michler v. Krey Packing Co., supra.

In the case of Thompson v. Railway Express Agency, Mo.App., 236 S.W.2d 36, loc. cit. 39, wherein the claimant alleged he suffered from a psychoneurosis resulting from an accidental injury, this court said: "A psychoneurosis under circumstances does present compensable injury but this should not open the way for indiscriminate compensation on that score simply because it follows an accident. The causal connection with the accident must be proven by clear evidence, for such a neurosis may arise from any number of causes."

The first contention presented in the first point relied on by the employee is that there is no substantial evidence to support the finding of the Commission "that the psychoneurotic condition did not evidence itself for almost a year after the accident." We find sufficient substantial evidence from which the Commission could have made this finding. After the employee returned to her employment March 7, 1955, she continued her usual work until she was discharged. During the year preceding her discharge she never complained to her superiors about her head or her eyes. The Commission could have found that she would have com-

plained of her head if it bothered her when she was told that unless her sales work improved she would be discharged. Dr. Milster in his testimony said she never complained about headaches or head pains to him at any time. Dr. Moore and Dr. Parsons did say the trauma was the cause of her condition. However, their opinions were based on statements made to them by the employee after her discharge and examinations made more than a year after the accident. Dr. Moore testified that the discharge would have acted as the precipitating factor if the employee made no complaints about her head to her superiors and if her work record for 1955 was on a par with her work record before the accident. The record shows that her sales for 1955 were almost identical in amount with her sales for 1954. The employee in her testimony stated that 1955 "was the biggest year I ever had." Dr. Moore admitted that if the employee thought the bump on the head was the reason for her work deficiency she would have used that as an excuse to her employer. He also admitted that if she had headaches during 1955, she would have complained about them to Dr. Milster. She did not complain to her superior, nor to Dr. Milster about headaches, according to their testimony. The opinion of Dr. Parsons that the trauma was the cause of her condition loses probative value when he said it was based on the assumption that the employee's work after the accident "was decreasingly effective." He said that if there was no difference in the effectiveness of the employee's work before and after the head injury, then the discharge was the precipitating factor bringing about the illness he found. The evidence shows there was no difference. Added to the above is the testimony of Dr. Sutter that the employee did not indicate to him she had a headache that was unbearable. Also, the testimony of Dr. Milster, that he saw nothing in the employee which would indicate any inability to work. It must be remembered that Dr. Milster saw her at regular intervals throughout the year 1955. The

above evidence is ample and substantial enough to support the finding challenged by the employee.

The next finding of the Commission challenged by the employee is that her work, though substandard, was on a par with her pre-accident level. Mr. Bevirt testified that the employee never did meet her quota which is sufficient proof that her work was substandard. The employee testified they were not satisfied with her sales ability. The evidence clearly shows that her sales after the accident were on a par with her pre-accident level sales. The employee admitted this when she testified 1955 was her biggest year. The records of her earnings for 1954 and 1955 support this finding of the Commission, which we rule is supported by substantial evidence.

The next finding of the Commission challenged by the employee is that the claimant made no complaints to her employer referable to the accident. It is the contention of the employee that the Commission cannot infer from her failure to complain, as testified by Mr. Bevirt, that she did not have the complaints. Obviously, the Commission believed Mr. Bevirt in this connection. The employee does not contend that she told her immediate superiors about her complaints. The only one she ever complained to, according to the employee's testimony, was a Miss Neihaus, who had no supervisory control over the employee. We think the finding is supported by substantial evidence and is not inconsistent with the conclusion reached by the Commission.

The last finding of the Commission complained of by the employee is that she did not file her claim for compensation until three days after her release from her employment. It is the contention of the employee that the Commission could not reasonably hold this as a finding in support of its conclusion. We see nothing in this finding that is inconsistent with the conclusion. It is a finding that the Commission could reasonably have considered in determining

when the psychoneurotic condition manifested itself. It does not have the same weight as the other findings, but it is not inconsistent with the conclusion reached by the Commission. We find there is substantial competent evidence to support the findings and the Award of the Commission.

 The final point relied on by the employee is that the overwhelming weight of the evidence shows her psychoneurotic condition was caused or precipitated by the accident. The employee's principal reliance in support of this point is the testimony of Drs. Moore and Parsons. Again, it should be stated that they did not see the employee before she was discharged. Their opinions that the trauma was the cause of her condition had to depend entirely on the history and complaints she related to them. Dr. Moore did not know that the employee did not complain to her superiors or to Dr. Milster about her head during the year following the accident. He did not know her work record for 1955 was on a par with her record prior to the accident. When asked to assume these facts as true he said the discharge would have acted as the precipitating factor. Dr. Parsons, in giving his opinion that the trauma was the cause of the employee's condition, assumed that the employee's work after the accident was decreasingly effective. As we have pointed out the evidence shows it was the same in 1955 as it was prior thereto. When asked to assume this fact as true, he then said the discharge was the precipitating factor bringing about the illness he found.

We pointed out in our case of Thompson v. Railway Express Agency, supra, that the causal connection of a psychoneurosis with an accident must be proven by clear evidence, for such neurosis may arise from any number of causes. We rule, in the light of the law and the evidence in this record, that the conclusion of the Commission is not against the overwhelming weight of the evidence.

Finding no error, the judgment of the Circuit Court should be affirmed. It is so ordered.

WOLFE, P. J., and JOHN K. REGAN, Special Judge, concur.