Glasco FRANKLIN, Jr. (Employee),
(Plaintiff) Respondent,

v.

ST. LOUIS INDEPENDENT PACKING COMPANY, A Division of Swift and Company (Employer), Security Mutual Casualty Company (Insurer), (Defendants) Appellants.

No. 30969.

St. Louis Court of Appeals.

Missouri.

Sept. 18, 1962.

Alexander & Robertson, and Leo C. Devoto, Jr., St. Louis, for appellants.

Max M. Librach, St. Louis, for respondent.

ANDERSON, Presiding Judge.

This is a proceeding under the Workmen's Compensation law, (§§ 287.010–287.-800 RSMo 1959, V.A.M.S.) instituted by Glasco Franklin, Jr., an employee of St. Louis Independent Packing Company. The claim arose out of an accident sustained by the employee which occurred December 18, 1958, on the premises of the employer.

After a hearing a referee of the Division of Workmen's Compensation entered an award in favor of claimant for permanent partial disability in the sum of $37.50 per week for 31.5 weeks, or a total of $1,181.25, based upon a finding of 15% permanent partial disability of the left arm at the elbow. Upon review the Industrial Commission affirmed the award, which award was likewise affirmed by the Circuit Court. From the judgment of the Circuit Court the employer, and its insurance carrier, Security Mutual Casualty Company, have appealed. The issue on this appeal is whether the award of 15% permanent partial disability is supported by competent and substantial evidence upon the whole record.

At the time of his injury claimant was employed as a hog shackler. The duties of a hog shackler are to place a chain around the leg of a hog and lift it onto a conveyor which carries the animal to the place where it is slaughtered. The conveyor is about waist high. Previous to being shackled the hogs are driven from an outer pen into a pen where the shackling takes place. This latter pen is about three and one-half to four feet wide and ten feet long; about eighteen or twenty hogs are driven into this pen at one time. Five men work at this operation; four do the shacking and one man drives the hogs into the inner pen. On December 18, 1958, claimant was engaged in this operation. On that day after he had driven some hogs into the shackling pen they became wild and excited when some chains slid down a rail making a noise. Claimant was standing behind them and the hogs backed up causing him to fall to the brick floor of the pen. As a result of this fall claimant sustained a laceration of his left arm at the elbow.

After his fall claimant reported to the first aid station located on the premises, where he was examined by a nurse and a doctor. He was then sent to Barnes Hospital for treatment. The doctors at Barnes Hospital treated the wound and sutured it with seven stitches. Claimant then went back to work that same day. At first claimant did not shackle hogs because he could not bend his arm. However, he did drive hogs into the pen. After seven or eight days he resumed all the duties connected with his employment, which included shackling. The only treatment he received for his injury was at Barnes Hospital and thereafter by Dr. Magee, the plant doctor. He saw Dr. Magee twice that he could recall. At the request of his attorney he was examined by Dr. Wennerman, but received no treatment from him.

At the hearing claimant testified that a sore spot developed around the elbow and that he has had pain in that area continuously since the accident. He stated that the pain "seems like get worser to me", and that the elbow "feel like it's getting a little bit larger." " * * * it seems like something developing there now. Something coming up in there, something soft-like coming out." * * * "It started out small, but now it's getting larger. * * * It's tender. * * * It hurts." On cross-examination he described this as a large mass which he did not have before the accident. Shortly before the hearing a pimple developed on this large mass. He also stated that his elbow is stiff in the morning until it loosens up at work. He further testified that he could move his elbow, "but it gives out on me. It gets tired during the day."

Upon returning to work, claimant did, after a few days, the same type of work he had done prior to the accident, that is, shackling hogs. The larger hogs run between 700 and 800 pounds, and the smaller ones between 250 and 350 pounds. Two men work together at this job. In an eight hour day with two men working they will shackle between 4,100 and 4,200 hogs if the hogs are large and small ones mixed. If all are small hogs they would shackle more.

When claimant was on the witness stand the Referee examined claimant's elbow, and dictated into the record the following:

"Let the record show that the Referee has examined both elbows of the

claimant, and that there appears to be some enlargement in the claimant's left elbow, and there appears to be some type of pimple on the enlarged place; and, further, that the claimant demonstrates no loss of motion in his elbow and no disability in the hand or wrist of either arm."

* * * "Let the record show that the claimant stated he had pain in his left elbow when the Referee examined it and pressed on the enlarged area."

Dr. Samson Wennerman testified on behalf of claimant. He stated he had examined claimant on June 6, 1959, and at that time his complaints were of pain, soreness, stiffness and weakness of the left elbow; that he also complained of a small swelling over the back of the left elbow. The doctor also testified that he examined claimant and found over the back of the left elbow a healed transverse laceration almost an inch long, which area was tender but nonadherent. He found no sensory loss. The doctor gave it as his opinion that the condition he found was the result of the trauma claimant has sustained. The witness further testified that he again examined the claimant on November 1959, at which time the latter still complained of pain, soreness, and swelling back of the left elbow. He stated that his examination of the elbow revealed a healed laceration, and that the area thereof was bluish and larger than the corresponding point on the other elbow. He also found that movements of the elbow could be carried out. He further testified that he rated claimant as having a disability amounting to partial permanent loss of the left elbow of ten percent. On cross-examination Dr. Wennerman testified that the movements of the left elbow were within the normal range; that there was a difference in size of the left arm and right arm at the elbow; that at the first examination of June 6, 1959, claimant complained of a small swelling back of the left elbow; that he was not impressed with it, by which he meant he didn't see any swelling that

he, at the time, thought was noteworthy; that there was no difference in the size of the elbows that would warrant his making a note of it; that his diagnosis on the second visit, November 28, 1959, was the same as on the previous visit; that at that time he noted the swelling in his physical examination, and had the elbow x-rayed again. He further testified that Bursitis is a painful condition. Dr. Wennerman then gave the following testimony.

"Q. * * * if the man's arm would move in the same manner in which the other arm moved, and there was no limitation of motion, on what basis did you make your rating of disability?

"A. Principally upon the fact that he complained of pain and the finding that he had adequate cause for pain. He had had a blow there; laceration, which had been sutured, and there was some swelling and enlargement of the elbow."

The doctor further testified he saw no evidence of acute inflammation present in claimant's case or evidence of acute swelling; that the pimple was not present at the time of the November 1959 examination, but that he saw it when he examined claimant just before the hearing; and that there was a swelling over the back of the elbow the size of a golf ball cut in two.

On redirect examination, Dr. Wennerman testified that the pimple on the elbow had nothing to do with claimant's disability; that the condition he saw (swelling) was due to the trauma claimant sustained; that it is larger than it was in November 1959, because he thought claimant had a Bursitis; that there is a tendency for elbow Bursitis to gradually get larger; that he was quite definite in his diagnosis. Claimant's elbow was again exhibited to the Referee, who dictated into the record the following:

"Let the record further show it (swelling on elbow) is an area approximately one and a half inches in di-

ameter about half the size of a golf ball, about the same diameter as a golf ball or slightly larger."

Dr. William E. Magee, plant physician for appellant, was called as a witness for the employer. He testified as follows: He saw claimant on December 18, 1958, at which time claimant had a laceration on his left elbow. At that time he put a temporary dressing on the elbow and sent him to Barnes Hospital, feeling that a surgeon should handle the matter. He next saw claimant on December 22, 1958, and according to directions from Dr. Copher of Barnes, who treated claimant, he continued claimant on anti-biotics, and dressings. He also recommended light work. In all Dr. Magee saw claimant six times, the last time being May 6, 1959, which was for the purpose of evaluation for rating purposes. No treatment was given on the last visit in May 1959. It was the doctor's impression at that time that the claimant was getting better. Claimant was not well at that time, but he thought claimant would, in another two months be further improved. There was no evidence of infection and the wound looked well, though there were complaints of pain in the elbow. No specific treatment was given other than the drugs that were prescribed. He did not recall claimant making any statement to him or the nurse that the elbow was getting larger. He saw claimant again on November 25, 1959. The history given him at that time was that the only trouble claimant had was some aching in the left elbow after working all day. He did not recall any complaint that the elbow was getting larger. His records did not show any notation of such complaint. When he saw claimant on November 25, 1959, he made an examination of the elbow and had claimant extend his arm, rotate it in all directions and flex the arm fully. This was done with his hand over the elbow in order to determine whether any crepitation was present. He also put pressure on the elbow with the tip of his fingers to determine if any tenderness was present, at which time claimant made no complaints of pain or discomfort. Claimant said he did not at the time feel any tenderness or pain, nor did claimant withdraw the arm when he put pressure on it. Based on his examination of November 25, 1959, he rated claimant's disability of the left elbow at "zero percent". The basis for such opinion was the absence of any objective evidence of any abnormality noted. He stated his record did not show any history of any complaints that the elbow was getting larger, or complaints about the use of his elbow since June of 1959.

On cross-examination Dr. Magee testified as follows: That he saw claimant on December 28, 1958 and gave him a course of treatment with anti-biotic medicine, because the wound was contaminated. However, there was no evidence of infection. He recommended light work for claimant for three weeks because he wanted the elbow to be immobilized during the recovery period, for fear that infection might set in. He saw claimant six times in all and two more times for rating purposes. At no time did claimant state that the tip of his elbow was getting larger, and that he (the doctor) did not see the elbow getting larger. He based his disability rating on objective findings because subjective findings are difficult to evaluate. He stated that the complaint of a slight ache in the elbow following eight hours of strenuous labor did not in his opinion depict a result of the accident. The laceration was over the olecranon processes, a region where one is apt to have a Bursitis, which is an accumulation of fluid within the olecranon bursa. He stated he had never seen a traumatic Bursitis of an elbow that didn't show manifestations of fluid accumulating within a week or earlier following the trauma, and that at the time he examined claimant on November 25, 1959 he did not think claimant had a Bursitis.

During this cross-examination Dr. Magee examined claimant's elbow and gave the following description of his observations:

"Overlying the olecranon processes of the left elbow is a transverse well-

healed linear scar approximately three and a half centimeters in length on the lateral side of which is one centimeter soft shinny nodule that is within the skin and freely movable, with no evidence of increased heat or redness around this nodule. On pressure over the nodule, Mr. Franklin withdraws somewhat."

"Q. Doctor, forgetting the nodule for a moment—Doctor, is the size of the elbow in the region I am indicating the same on both; or, is one larger than the other?

"A. Aside from the slight thickening of the skin that is seen over the left elbow, I would not be able to state unless I took a pair of calipers, or similar measuring device, and actually measured the two areas. There's an apparent enlargement of this left side, which I believe is tied in with the thickening of the skin in the area of the scar.

"Q. Doctor, would you say that thickening of the skin is approximately the size of half a golf ball?

"A. I don't think it's quite that large, * * *.

" * * * this elbow appears different in one respect, one major respect, at this particular time, and that is that this nodule that is present on the lateral side of this scar wasn't present at the time of my examination on November 25, 1959."

The witness further testified that the phrase, "One olecranon Bursa had been opened" which appeared in the report of Dr. Copher of Barnes Hospital, meant that the wound extended into the Olecranon Bursa which is a way that Bursitis can start, and that claimant had pain and swelling in his elbow during the early course of his injury. He further testified that his examination of claimant during the ensuing weeks did not demonstrate any unusual amount of swelling or crepitation which would lead him to believe that claimant had a progressive Bursitis; that when a Bursa is opened traumatically there is bound to be some inflammation, but in claimant's case it appeared to heal very well. He further stated he had never been aware of any Bursitis that wasn't painful.

On recross-examination, Dr. Magee testified that he thought that the swelling mentioned was not a residual of a traumatic tearing of the Bursa of the left elbow, but a lesion localized to the skin and a thickening within the skin which could possibly be a subcutaneous cyst which most probably had no tie-in with the accident. He further stated that claimant did have a Bursitis; that the only thing that he saw that he could connect with the injury was the scar.

■ The question presented by this appeal is whether the findings and award of the Industrial Commission are supported by competent and substantial evidence upon the whole record. Wood v. Wagner Electric Corp., 335 Mo. 670, 197 S.W.2d 647; Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55. Appellants, in support of their contention that there was a complete lack of substantial evidence to support the award, urge that the record shows claimant suffered no loss of bodily function, and point to the evidence showing no loss of movement of his left arm as a result of the accident, and to the fact that within seven or eight days after his injury, claimant went back to his job as a hog shackler. This evidence is true, but not conclusive. An employee may have a permanent partial disability within the meaning of the Workmen's Compensation Act, and still be able to work. Cole v. Best Motor Lines, Mo.App., 303 S.W.2d 170; Worley v. Swift & Co., Mo.App., 231 S.W.2d 808. Nor is actual loss of earnings an essential element of a claim for permanent partial disability. Carr v. John W. Rowan Plastering Co., 227 Mo.App. 562, 55 S.W.2d 727; Worley v. Swift & Co., su-

pra; Sleets v. St. Louis Material & Supply Co., Mo.App., 39 S.W.2d 821; Betz v. Columbia Tel. Co., 224 Mo.App. 1004, 24 S.W.2d 224. In the latter case, claimant was awarded permanent partial disability for the loss of 31 teeth, and in affirming the award, the Court, after referring to certain New Jersey cases, said (24 S.W.2d 1. c. 229):

> "It is notable that in these cases the word 'disability' is given a broader meaning than the limited one ascribed to it in the decisions of other states. It is held that compensation for disability is allowable in cases of injury which destroys or impairs a member or a function of a part of the body, irrespective of the question of reduced earning capacity. The course of reasoning, evidenced by these opinions, is in keeping with the just, humane, and beneficent, as well as economic, purposes intended by legislation of this character, and is worthy to be followed. In this connection, we perceive that our statute is even broader and more elastic than the New Jersey statute, and that it not only permits recovery for 'disability', but provides compensation for various 'injuries,' independent of the question of disability, in the sense that it causes a loss of earning power."

■ In the case at bar claimant did sustain an injury to his left elbow, and there was testimony that thereafter up to the time of the hearing he suffered pain and soreness in that area. It also appears from claimant's evidence that his arm at the elbow became enlarged. This enlargement, according to the testimony of Dr. Wennerman, was the size of a golf ball cut in half. The Referee at the hearing, after viewing the elbow, made a like observation with reference to the size of the enlargement. Dr. Wennerman testified that, in his opinion, this swelling or enlargement was due to the trauma claimant sustained on December 18, 1958. There was also evidence from which it could be found that the trauma caused a progressive Bursitis in the elbow. There was also testimony that although claimant suffered no loss of motion in his elbow "it gives out" on him and gets tired during the day. It also appears that claimant complained to Dr. Magee of weakness in his arm at the time he examined claimant.

After a review of the testimony, it is our judgment that there was competent and substantial evidence to support a finding of permanent partial disability within the meaning of the Act. Betz v. Columbia Tel. Co., supra; Carr v. John W. Rowan Plastering Co., supra.

■ Nor can we say that the percentage of disability found is not sustained by competent and substantial evidence, or that it is contrary to the overwhelming weight of the evidence. The Commission was not bound by the testimony of the medical witnesses, but was under a duty to weigh that evidence as well as all the other testimony and reach its own conclusion as to the percentage of disability suffered. The Commission also had before it the observations of the Referee who, at the hearing, examined the claimant's arm, which observations were dictated into the record. The evidence offered by appellants, in our opinion, merely presented a conflict of evidence to be resolved by the Commission. Kraus v. Sefton Nat. Fibre Can Co., Mo.App., 35 S.W. 2d 920; Johnson v. Fogertey Bldg. Co., Mo. App., 194 S.W.2d 984; Williams v. Laclede-Christy Clay Products Co., Mo.App., 227 S.W.2d 507; Cole v. Best Motor Lines, supra.

On the whole record before us, we find no ground which would authorize us to interfere with the finding and award of the Commission. The judgment of the Circuit Court is affirmed.

WOLFE, J., concurs.

ELGIN T. FULLER, Special Judge, dubitante.