Donald Dean GUNNERSON, Respondent,

v.

KANSAS CITY STRUCTURAL STEEL COMPANY, and Royal Indemnity Company, Appellants.

No. KCD 28086.

Missouri Court of Appeals, Kansas City District.

March 29, 1976.

Harold J. Maddox, Kansas City, for appellants.

Arthur H. Stoup, Thomas E. Thompson, Kansas City, for respondent.

Before TURNAGE, P. J., and WELBORN and HIGGINS, Special Judges.

ROBERT R. WELBORN, Special Judge.

Workmen's Compensation proceeding. Referee of Division of Workmen's Compensation found for employee and awarded 30 weeks of temporary total disability at $63.50 per week and 340 weeks of permanent partial disability at $58.00 per week. The Labor and Industrial Relations Commission affirmed the award of the referee. The award was in turn affirmed by the Jackson County Circuit Court.

Donald Dean Gunnerson was employed by Kansas City Structural Steel Company as an ironworker. On December 27, 1969, he was working on the installation of an exhaust fan on the roof of a building at the Sheffield-Armco Plant in Kansas City. Gunnerson was working at the apex of a V-shaped metal roof. He had been lifted some 80 feet to the eaves of the roof on a "headache ball." From that point he climbed to the apex of the roof with the aid of a rope.

Gunnerson had been on the roof for about two hours when around 2:00 or 2:30 P.M. he had to go to the restroom. Rain which had been falling earlier had turned to sleet and the roof was icy. So was the rope and Gunnerson decided not to try to go down it to the eaves. Instead, he started to walk across the sloping roof to the end of the building where there was a handrail and stairs. While walking about halfway between the eaves and the apex, he started sliding down the roof. He went to his knees in an effort to get hold of something to stop his sliding. He found nothing to hold so he lay down on his stomach and spread out in an effort to stop. He continued to slide and lost consciousness before he slid over the eaves. He fell to the roof of a lean-to. He was taken off the roof by the crane operator. His hard hat was cracked for about 1½ inches by the impact of the fall.

He was taken by ambulance to St. Joseph Hospital where he was found to have injuries to his head, neck, left arm, leg and buttocks. He was hospitalized for three days. The discharge diagnosis was: Cerebral concussion and Renal contusion. He was off work for about a week following his discharge from the hospital.

On February 12, 1970, he was readmitted to St. Joseph Hospital, complaining of a "tight" feeling in his left arm, back and left leg pain and neck pain. He received physiotherapy treatment and on his discharge February 21 was provided with a neck brace.

Because of various problems connected with his injuries and the treatment, he worked only about 50% of the time between March, 1970 and July 3, 1970, when he was again hospitalized for the same complaint, this time at Research Hospital. He received physiotherapy and was treated by traction. Upon his discharge on July 21, he was provided a back brace and a traction device for use at home. For three or four months, he was unable to work because of headaches and pain in his back, arm and leg.

Following his second hospitalization, Gunnerson had problems with shaking while he was working and lost one job because fellow-employees complained that he was shaking the scaffolding on which they were working. By November, 1970, he was having emotional difficulties, evidenced by difficulty in getting along with fellow-employees and his wife and children. He began to have difficulty holding a job more than a week or two at a time. He would either be terminated by the employer or quit work to avoid a fight. He became frightened by heights and it became difficult for him to get up on ladders and scaffolds. His weight dropped from around 210 to 165 or 175 pounds. He was unable to work for more than half the time.

In March, 1971, Gunnerson's attorney arranged for his client to visit Dr. George J. Lytton, a psychiatrist. Based upon his interview with the patient and subsequent psychological testing, Doctor Lytton concluded that Gunnerson was suffering from a depressive reaction caused by his December, 1969 fall. Doctor Lytton offered no

treatment and did not see Gunnerson again for more than a year. Gunnerson did not keep an appointment with Doctor Lytton in April, 1972. In May, arrangements were made for Mrs. Gunnerson to visit Doctor Lytton and she told him of the difficulties she was having with her husband. Doctor Lytton saw Mr. Gunnerson on May 6, 1972. At that time the claimant was "profoundly depressed, blue and gloomy." Doctor Lytton again concluded that he was suffering from a depressive reaction.

In July, 1972, claimant's wife filed for divorce, alleging that her husband had "slapped her around" and threatened her with physical harm. A divorce was granted in October, 1972.

On October 13, 1972, Gunnerson was re-admitted to Research Hospital, "visibly shaking" and complaining of headaches and back pain. He was discharged on October 18, with a primary diagnosis of "back pain of questionable etiology."

On October 27, 1972, he was again seen by Doctor Lytton, to whom he complained of inability to sleep, inability to work and loss of weight. Doctor Lytton again concluded that he was suffering from depressive reaction which had become more severe.

Doctor Lytton saw claimant next on March 16, 1973. His complaints were similar to those previously voiced and Doctor Lytton concluded that the patient's depression was becoming accelerated. He expressed a similar view following a visit on June 20, 1973. Following this visit Doctor Lytton recommended psychiatric treatment at an estimated cost of $5,000 "to halt this deterioration."

On September 4, 1973, Gunnerson stopped by Doctor Lytton's office and left a note which the doctor considered "strongly suicidal." He arranged for the claimant's hospitalization at Research.

In June, 1973, Gunnerson had been seen in psychiatric evaluation by Doctor Bidwell, a psychiatrist for the employer-insurer. Doctor Bidwell saw Gunnerson several times thereafter, and, after the September,

1973 hospitalization at Research, Doctor Lytton got in touch with Doctor Bidwell who arranged for the patient to be transferred to Menorah Hospital under Doctor Bidwell's care. Because Gunnerson did not wish to remain in the hospital, he was discharged and continued to see Doctor Bidwell as an outpatient. In a psychiatric evaluation, dated July 5, 1973, following Gunnerson's June visit and neuropsychological testing, Doctor Bidwell concluded:

"It would seem that following his fall he [Donald Gunnerson] suffered some form of cerebral contusion which has left him with severe psychological impairment. The fact that it has taken the form of depression with psychomotor retardation probably has much to do with his premorbid personality. However, the precipitating event would seem to have been his injury in 1969."

Gunnerson's workmen's compensation claim was heard by a referee of the division in January, 1974. In addition to the medical and psychiatric record of Gunnerson's care and treatment following the December, 1969 fall, the claimant and his former wife testified to personality changes, manifested in various ways. Doctors Lytton and Bidwell appeared as witnesses and both asserted the conclusion stated in this report that the claimant's psychiatric problems had been precipitated by the fall. The employer-insurer offered no contradictory medical or psychiatric evidence, but sought by cross-examination of the claimant and the witnesses produced by him to relate the psychiatric problems to the claimant's rejection by his natural parents. The employer-insurer's cross-examination attempted to show that claimant was emotionally unstable prior to the fall.

The referee made the following findings:

"I find and believe from all of the credible evidence that the employee, Donald Dean Gunnerson, sustained an accident arising out of and in the course of his employment with the employer, Kansas City Structural Steel Company, when on or about December 27, 1969, in Kansas City, Jackson County, Missouri, he was working on the job on the roof of a building and while

walking across the roof of said building to go to the restroom he slipped and fell and then slid down said roof to a point where he fell off of said roof and landed on the roof of a lean-to adjacent to and a part of said main building.

"I further find and believe from all of the credible evidence that as a direct and proximate result of said accident he sustained injuries to his head, neck, back, left arm and psyche."

These findings were affirmed by the Labor and Industrial Relations Commission and the circuit court.

On this appeal, the first contention of the appellants, employer and insurer, is that the award was beyond the powers of the Commission because it was based upon injury to the "psyche" which was neither pleaded nor proved.

■ Appellants acknowledge that, on April 4, 1973, the respondent's claim, originally filed in February, 1970, and referring only to injuries of an orthopedic nature, was amended to allege that, as a result of the fall, he had suffered a "depressive reaction." A depressive reaction is a condition involving the mind. The words "mind" and "psyche" are synonymous. Webster's Third New International Dictionary (1966). The referee's use of the term "psyche" was obviously intended to refer to the portion of the body which had sustained injury. Appellants acknowledge that the issue of a depressive reaction was tried before the referee. The evidence clearly supported the conclusion that claimant had suffered a depressive reaction.

■ The conclusion of an injury to the "psyche" was obviously a finding by the referee on the depressive reaction aspect of the claim, and was within the scope of the claim which had been presented on that basis.

Appellants next contend that the award is beyond the authority of the Commission because the Commission failed to require respondent's pastor to testify.

As above noted, appellants' theory at the hearing before the referee was that respondent's mental problems antedated his fall. On his cross-examination Gunnerson stated that between the time of his marriage in 1964 and December, 1969, he and his wife had gone to their pastor, Tommy Burgdorff at the Antioch Baptist Church, on two occasions for counseling because of domestic "typical disagreements." Respondent's former wife testified that they saw Reverend Burgdorff "a couple of times" "over small disagreements."

Reverend Burgdorff was subpoenaed as a witness by appellants. He acknowledged that the Gunnersons had come to him on various occasions for marriage counseling because of problems in their marriage. He acknowledged that he talked to them about problems in their marriage, but he refused to relate any statements made to him by the Gunnersons. He said: "I feel that these statements that were made to me are made in my professional connection as a clergyman and they are a part of a sacred trust to me that I do not feel that I can divulge." He acknowledged that his church, the Southern Baptist denomination, had no canons or rules requiring confession by its members. He stated that the Bible is the book of faith of his denomination and governs his church. He said that the New Testament does encourage confession of sins. Appellants' counsel made an offer of proof that, if Reverend Burgdorff did testify, he would testify that, prior to December, 1969, Mrs. Gunnerson had complained to Reverend Burgdorff of her husband's moodiness and depression and of his fits of rage, in which he either threatened to or in fact did beat her. The referee sustained an objection to the offer of proof.

The parties here have briefed this contention on the basis of the admissibility of Reverend Burgdorff's testimony, under § 491.060(4), as follows:

"The following persons shall be incompetent to testify:

* * * * * *

"(4) A minister of the gospel or priest of any denomination, concerning a confession made to him in his professional character,

in the course of discipline enjoined by the rules of practice of such denomination; * * *."

Assuming that the testimony would have been admissible (compare *Pardie v. Pardie,* 158 N.W.2d 641, 645[8] (Iowa 1968), and *Simrin v. Simrin,* 233 Cal.App.2d 90, 43 Cal. Rptr. 376, 378–379[9] (1965)), the question remains whether or not its exclusion requires reversal of the Commission's decision. In arguing that the testimony should have been admitted, appellants assert that the evidence "established" that respondent had a traumatic childhood; that prior to December, 1969, respondent "would argue and find fault with his wife and over-punish their daughter, giving rise to strong arguments between the respondent and his wife," and that, because of arguments, the respondent and his wife sought marriage counseling from Reverend Burgdorff prior to December, 1969.

Whether or not these facts were "established," there was evidence on such matters for the consideration of the Commission. Thus the expected testimony of Reverend Burgdorff would at the most have been cumulative on the issue of respondent's mental state prior to December, 1969. Furthermore, appellants' counsel was permitted to ask Doctor Lytton a hypothetical question, based upon the assumption of the matters contained in the offer of proof with respect to Reverend Burgdorff's testimony. The following appears in the cross-examination of Doctor Lytton:

" * * * Assume that prior to December 1969, prior to this fall, that the Gunnersons went to Reverend Burgdorff and that Mrs. Gunnerson advised the Reverend that Mr. Gunnerson had threatened to beat her up and had periods of moodiness and gloom and depression; that he counseled them for that; what kind of condition, mentally, would Mr. Gunnerson have been suffering from at that time, in your opinion?

"A I don't know. I didn't have a chance to examine him at that time.

"Q If those things are true, would you also tag him at that time, prior to 1969, as a depression reactive?

"A It could, might could, or might just call him a bad boy.

"Q Are you calling him a bad boy after December 1969?

"A I didn't say anything about that. You said about that time, I said he could either be depressed or just a bad boy, I don't know, but I can tell you at the time that I saw him, since then, he has been depressed.

"Q You assume that on occasion Mr. Gunnerson would be moody and depressed for hours at a time, prior to December 1969, would that suggest to you a depression reaction?

"A It could, I don't know, I didn't examine him.

"Q Is that the kind of thing a person like that does?

"A It could.

"Q And if we are able to establish that— in the trial of this case through Reverend Burgdorff and other people of those depressions and moody spells, and violence prior to December 1969, would you have a different opinion about the amount of disability?

"A I don't know."

 The rejection by the Commission of competent and material evidence may require that the order be reversed and the matter remanded to the Commission for consideration anew in the light of such erroneously excluded evidence. *Smith v. Smith,* 361 Mo. 894, 237 S.W.2d 84, 87[3] (1951); *Wills v. Berberich's Delivery Co.,* 339 Mo. 856, 98 S.W.2d 569, 571[2–4] (1936). However, the erroneous exclusion of evidence of a cumulative nature does not invoke this rule. See *Johnson v. Park N Shop,* 446 S.W.2d 182, 188 (Mo.App.1969); *Carter-Wallace Inc. v. Gardner,* 417 F.2d 1086, 1096[17, 18] (4th Cir. 1969). Here the evidence would have been cumulative and it was shown not to have affected the opinion of respondent's psychiatric witness as to the cause of respondent's depressive reaction. In such circumstances, there is no reason to remand the matter to the Commission for consideration anew.

■ Appellants next contend that respondent should have been denied benefits for the claimed mental condition because he failed to give appellants reasonable and timely notice that he was claiming a mental condition as a result of the fall in question. Appellants contend that they showed that they were prejudiced by failure to receive notice of a claim based upon such condition.

Appellants acknowledged actual notice of the accident which gave rise to the claim. They contend, however, that, although Doctor Lytton had found the depressive reaction condition to have existed in March, 1971 and discussed the matter with respondent's counsel, no notice was given appellants of such condition until June, 1972. Appellants' claim of prejudice by reason of the failure to receive earlier notice is premised on Doctor Lytton's testimony that respondent's disability, rated at 65 to 75% as of March, 1971, declined to 55 to 65% in June, 1972, following treatment.

Appellants argue:

"By reason of the above, it must necessarily follow then that in view of Doctor Lytton's admissions that treatment would have helped the respondent in March of 1971 and in fact did, the final rating is 85%, i. e., at least 20% greater than it would have been had treatment been given in March of 1971 and had the employer and insurer been given notice of the claimed mental condition and been given an opportunity to provide the respondent with treatment. It is also probable by reason of Doctor Lytton's testimony, the disability could have been reduced by 30% of the body."

The referee and the Commission were not obliged to accept this reasoning. In the first place, the reduction in disability between March, 1971 and June, 1972 did not follow treatment for no treatment was given during that period. Secondly, even after notice was given appellants in June, 1972 of the claim based on the mental condition, appellants did not have their psychiatrist examine respondent until June, 1973. Instead of providing treatment once the condition had been called to the attention of appellants, appellants sought to take the

respondent's deposition rather than to offer treatment. In these circumstances the conclusion that appellants did not show prejudice by reason of the delayed notice will not be disturbed.

Appellants next assert that, on several matters, the award was not supported by substantial and competent evidence and was contrary to the overwhelming weight of the evidence. The first matter complained of is the finding of an injury to the "psyche". Appellants assert there was no evidence of such an injury. This problem has already been dealt with. What was said above answers the objection here raised.

■ Appellants next assert that the Commission erred in failing to find that respondent's depressive reaction started in his early childhood and developed as he grew older and was not the result of the fall in question. Appellants' argument on this score ignores all of the well-established, often repeated law on the nature of judicial review of factual findings of the Commission. Appellants have simply marshalled all of the evidence which might have supported the finding for which they contend and have completely ignored the contrary evidence which supports the finding made. It does not avail appellants to cite the case of *Patane v. Stix, Baer and Fuller,* 326 S.W.2d 402 (Mo.App.1959), in which the Commission did find that the psychoneurotic condition there involved was a pre-existing condition, not the result of an employment related accident. That case merely demonstrates that the question is for the Commission when different conclusions may be drawn from the evidence. Just as the court in the Patane case did not substitute its conclusion for that of the Commission, this court will not do so in this case.

Nor is this case similar to *Griggs v. A. B. Chance Company,* 503 S.W.2d 697 (Mo.App. 1973), where equivocal medical testimony was held inadequate to relate the disability there claimed to the employment related accident. Here Doctor Lytton stated unequivocally that the depressive reaction was caused by the fall and Doctor Bidwell, the

psychiatrist employed by the appellants, stated that, although respondent's psychological impairment in the form of depression with psychomotor retardation probably was related to his "premorbid personality," " * * * the precipitating event would have to have been his injury in 1969." Thus, there was substantial and competent evidentiary support for the Commission's finding.

■ Appellants next attack the finding of 85% disability of respondent. Their argument on this point is prefaced as follows:

"It is to be remembered that the basis for awarding permanent partial disability is competent and substantial evidence of present and future impairment of earning power. *Franklin v. St. Louis Independent Packing Company*, 360 S.W.2d 350 (Mo. App.)."

The cited case does not support this proposition. In that case the court stated (360 S.W.2d 354):

" * * * An employee may have a permanent partial disability within the meaning of the Workmen's Compensation Act, and still be able to work. *Cole v. Best Motor Lines*, Mo.App., 303 S.W.2d 170; *Worley v. Swift & Co.*, Mo.App., 231 S.W.2d 828. Nor is actual loss of earnings an essential element of a claim for permanent partial disability. *Carr v. John W. Rowan Plastering Co.*, 227 Mo.App. 562, 55 S.W.2d 727; *Worley v. Swift & Co., supra*; *Sleets v. St. Louis Material & Supply Co.*, Mo. App., 39 S.W.2d 821; *Betz v. Columbia Tel. Co.*, 224 Mo.App. 1004, 24 S.W.2d 224. * * * "

See also *Komosa v. Monsanto Chemical Company*, 317 S.W.2d 396, 400[7] (Mo. banc 1958); *Davis v. Brezner*, 380 S.W.2d 523, 528[6–9] (Mo.App.1964).

Appellants' citations to cases from other jurisdictions (*Joyce v. Chicopee Manufacturing Company*, 103 N.H. 471, 175 A.2d 521 (1961), *Ede v. Ruhe Motor Corp.*, 184 Pa.Super. 603, 136 A.2d 151 (1957) and *Benedict v. Fox*, 192 Pa.Super. 197, 159 A.2d 756 (1960)) are not helpful, dealing as they do with statutes different from those of Missouri.

Doctor Lytton testified that, based upon his examination of January 11, 1974, he felt that respondent had an 85% disability of the body as a whole as a result of a neurotic depressive condition. He also stated that he considered the condition permanent. This court cannot say that the disability finding is not supported by competent, substantial evidence.

■ Appellants next contend that the finding that respondent sustained an injury in a compensable accident is not based upon substantial and competent evidence and was contrary to the weight of the evidence.

The respondent's version of his fall has been set forth previously. No eyewitness testimony contradicted the respondent's version of the incident. Appellants contend that the evidence established that the fall was the result of a previously existing condition which involved dizzy spells on the part of respondent. Appellants did offer evidence from respondent's foreman that respondent had complained to him some six months before the fall of dizziness. Respondent denied that he had dizzy spells before the fall. Appellants point to language in a report of the surgeon who first saw respondent when he was hospitalized following the fall. In that report the doctor stated: "Patient states the last he remembers he was on roof of electric furnace. Starting down for drink of water, fellow workers found him on roof of lean-to." The same doctor, in his history in the record of the respondent's December 29 hospitalization, stated that the patient fell a long distance from a roof and "was knocked unconscious." Appellants also call attention to the statement in the respondent's history on his July, 1974 hospitalization to the effect that respondent stated that " * * * he thinks he was unconscious before he fell, but really thought he blacked out because he was faint." This report was signed by Doctor Coburn. Doctor Coburn had previously seen respondent at the request of appellants in May, 1970, at which time he made a report to appellants' counsel

in which he stated: "Mr. Gunnerson stated that on December 27, 1969, while employed by Kansas City Structural Steel Company, he fell about forty feet, sliding from an iced sheet metal building to a lower metal building. He said he was unconscious before he fell, but thinks from fear because he guessed as he looked around and couldn't find anything to grab, he blacked out."

There was positive direct evidence to support the findings that respondent had sustained an accidental injury within the meaning of the Workmen's Compensation Law. There were some inconsistencies in the physicians' reports, but they were for the fact finder to resolve and do not rise to the level of destroying the direct evidence of the occurrence. The direct positive evidence here present distinguishes this case from *Griggs v. A. B. Chance Company,* 503 S.W.2d 697 (Mo.App.1973), relied upon by appellants.

■ Under this point appellants have also argued a claim of error on the part of the Commission in excluding records of prior litigation involving respondent in which he had claimed a head injury in a 1966 automobile collision. Inasmuch as such claim is beyond the scope of appellants' assignment of error under this point, it will not be considered. *Massey-Harris Co. v. Rich,* 233 Mo.App. 509, 122 S.W.2d 858, 867–868[11] (1938).

■ Respondent's motion for assessment of damages for frivolous appeal, ordered taken with the case, is overruled. Appellants have presented justiciable questions on this appeal and there is no basis for the conclusion that the appeal was solely for the purpose of vexation and delay.

Judgment affirmed.

All concur.